Clifford W. MURPHY, Trustee of American Drilling Service Company Liquidating Trust, Appellant,

v.

A. A. MATHEWS, a DIVISION OF CRS GROUP ENGINEERS, INC., Respondent.

No. 74550.

Supreme Court of Missouri, En Banc.

Nov. 24, 1992.

Rehearing Overruled Dec. 18, 1992.

P. Terence Crebs, Craig A. Newman, Patricia N. McCloskey, St. Louis, for appellant.

Kenneth Slavens, James P. Reinert, St. Louis, for respondent.

PRICE, Judge.

This case presents an issue of first impression in Missouri: whether a cause of action for negligence may be stated against a professional who agrees to provide litigation-related services for compensation. We hold that witness immunity does not bar suit if the professional is negligent in providing the agreed services.

## I.

Appellant, Clifford W. Murphy, Trustee of American Drilling Service Company Liquidating Trust ("American"), appeals the dismissal of its engineering malpractice claim against respondent, A.A. Mathews, a division of CRS Group Engineers, Inc., ("Mathews"). American's claim arose from services provided by Mathews concerning an arbitration proceeding brought by American against Zurn Industries, Inc., ("Zurn").

American subcontracted with Zurn to perform foundation work for six nuclear cooling towers. Construction problems arose causing additional expenses for American. In 1980, American retained Mathews, as professional engineers, to prepare claims for additional compensation from Zurn and to present those claims at an arbitration proceeding, if necessary. Mathews testified at the arbitration proceeding on behalf of American for additional compensation in the amount of $4,888,390. The arbitrators awarded American $1,118,608.

American filed suit against Mathews on October 23, 1984. The original petition consisted of a single count alleging that Mathews was negligent in its performance of professional services involving the preparation and documentation of American's claims for additional compensation from Zurn. Consequently, American alleges that it was unable to support its claims for all of the additional compensation.

In response to a motion for more definite statement, an amended petition was filed on June 26, 1990, specifically pleading negligence. On August 14, 1990, American filed its second amended petition. Count I sounded in negligence and Count II alleged breach of contract based upon Mathews' breach of its agreement to provide professional engineering services. Prior to trial, the court dismissed American's breach of contract claim as untimely. Nine days into trial, the court ordered a mistrial and then dismissed the remaining count of negligence for failure to state a cause of action based upon witness immunity.

■ Because this matter is before us on a motion to dismiss, we must accept plaintiff's properly pleaded facts as true. We must also give those averments liberal construction and draw all reasonable inferences that are fairly deducible from the facts stated. *Concerned Parents v. Caruthersville School Dist. 18,* 548 S.W.2d 554, 558 (Mo. banc 1977). Thus, we test the sufficiency of the petition on the premise that the defendant's engineers were negligent in their preparation and documentation of plaintiff's claims for additional compensation from Zurn. Count I of American's second amended petition, at paragraphs 12–14, sets forth the allegations at issue:

12. That defendants [Mathews], as professional engineers, in documenting, evaluating and reporting of plaintiff's claims for additional compensation against Zurn Industries were negligent and careless in one, some or all of the following particulars:

a. The form of report prepared by defendants to be completed by American Drilling's job site engineering personnel, the Daily Caisson Summary, was not adequate for the purpose intended. Such inadequacies include, *inter alia:*

(1) failure to document or record job site occurrences or events on a pier-by-pier basis;

(2) failure to contain necessary explanations of the various columns on the report in order to ensure accurate

understanding and documentation by American Drilling's field personnel;

(3) failure to document, or failure to document with requisite detail, job site occurrences or events necessary to support a claim for extra compensation;

(4) failure to document all necessary job site occurrences or events on the Daily Caisson Summary such that a later compilation of various field documents was deemed necessary; and

(5) failure to construct such Daily Caisson Summary in such a manner that it would bear a one-to-one relationship to the final claims documents;

b. The instructions given by defendant American Drilling's job site engineering personnel or the methodology for the completion of the form of the Daily Caisson Summary was inadequate for such job site personnel, in all cases, to accurately complete such documentation in the field;

c. Defendants failed to provide on-site assistance in, or on-site supervision of, the completion of the Daily Caisson Summary and other source documentation;

d. Defendants failed to timely review the Daily Caisson Summary and other source documents sent to them by American Drilling and thus failed to correct any documentation ambiguities, insufficiencies or discrepancies which could have been discovered and corrected upon prompt and reasonable inspection and inquiry;

e. Defendants failed to discover documentation ambiguities, insufficiencies or discrepancies which may have existed in or among the various job site or source documents;

f. Defendants failed to document the claims clearly and cogently such that they could be understood;

g. Defendants failed to document the claims in a manner which would avoid the appearance that the data was manipulated and therefore not credible;

h. Defendants failed to provide a detailed explanation in the claims documents as to why the hours in the Daily Caisson Summary deviated from the hours reflected in the claims documents;

i. Defendants attempted to condense the claims data and oversimplify the record keeping in such a manner as to cause the claims to be vague, unspecific and ambiguous;

j. Defendants received the completed Daily Caisson Summaries for perusal, study and posting by defendants' engineers to the various subcontract and non-subcontract claimable work categories, but defendants' engineers unilaterally altered, amended, changed or misallocated hours documented in such Daily Caisson Summaries when preparing claims on American Drilling's behalf so as to cause unexplained and insupportable discrepancies and inconsistencies between the Daily Caisson Summaries and the claims for additional compensation prepared by defendants, so as to render the claims incorrect and unreliable and subject [sic] plaintiff to charges of misconduct by Zurn Industries, Inc. Such discrepancies and inconsistencies were manifested in a variety of ways including, but not limited to the following:

(1) The Daily Caisson Summary would reflect no hours worked on a particular caisson on a particular day, but the claims documents prepared by defendants would reflect various hours worked on the caisson for that day;

(2) The Daily Caisson Summary would reflect various hours worked on a particular caisson on a particular day, but the claims documents prepared by defendants would reflect no hours worked on that caisson on that day;

(3) Hours would be allocated as "contract" items in the Daily Caisson Summary but allocated as "delays" in the claims documents prepared by defendants, and vice-versa;

(4) Hours would be allocated in a particular category of work type in the Daily Caisson Summary but allocated to an entirely different category of

work type in the claims documents prepared by defendants; and

(5) Specific amounts of hours shown in the Daily Caisson Summary would differ from the specific amounts of hours shown in the claims documents as prepared by defendants;

k. Defendants' professional engineers were either unable or unwilling to reconcile and resolve the discrepancies and inconsistencies described herein above.

13. That had defendants properly fulfilled their duty to exercise such reasonable degree of care, skill and ability as is ordinarily exercised under the same or similar conditions and under like circumstances by engineers generally in practicing their profession, American Drilling would have received an additional $3,769,782.00 as stated in American Drilling's claim for additional compensation prepared by defendants, which sum American Drilling was actually entitled to as additional compensation and was due and owing to American Drilling by Zurn Industries, Inc.

14. That as a direct and proximate result of the negligence and carelessness of defendants, plaintiff has been injured and damaged in the amount of $3,769,-782.00.

■ Missouri law generally holds that a professional owes to his or her client a duty of care commensurate with the degree of care, skill and proficiency commonly exercised by ordinarily skillful, careful and prudent professionals. When the degree of care provided does not meet this standard, a cause of action for damages may be stated. *Steel v. Woods*, 327 S.W.2d 187 (Mo.1959); *Siteman v. Woodward–Clyde & Associates, Inc.*, 503 S.W.2d 141 (Mo.App. 1973); *Roehl v. Ralph*, 84 S.W.2d 405 (Mo. App.1935). In response to these claims and allegations, however, Mathews has asserted the defense of witness immunity.

Missouri has recognized witness immunity. The immunity is one that is generally related to defamation actions against adverse witnesses. *Hager v. Major*, 353 Mo. 1166, 186 S.W.2d 564 (1945); *Laun v. Union Electric*, 350 Mo. 572, 166 S.W.2d 1065 (1943); *Jones v. Brownlee*, 161 Mo. 258, 61

S.W. 795 (1901); *Hyde v. McCabe*, 100 Mo. 412, 13 S.W. 875 (1890). Thus, we must determine whether this immunity should be extended to bar malpractice claims against professionals hired to perform litigation support services.

## II.

### A.

■ An examination of the history of witness immunity is in order to determine whether the underlying policy considerations justify its extension to protect a professional who negligently performs litigation support services. An immunity is a freedom from suit or liability. The underlying premise of all immunities is that "though the defendant might be a wrongdoer, social values of great importance require[d] that the defendant escape liability." Prosser and Keeton on Torts 1032 (5th ed. 1984). In the present case, we are concerned only with witness immunity, which is just one of many immunities. *Id.* It is one occasion "on which a written or spoken expression of opinion or statement of facts, otherwise defamatory, is not ordinarily actionable as a libel or slander." *Hyde*, 13 S.W. at 876.

■ The primary rationale supporting witness immunity is twofold. First, witnesses may be reluctant to testify if they are subject to a retaliatory suit by an aggrieved party. Second, witnesses may be inclined to shade their testimony in fear of a retaliatory suit. *Briscoe v. LaHue*, 460 U.S. 325, 333, 103 S.Ct. 1108, 1114, 75 L.Ed.2d 96 (1983). While the rationale for witness immunity clearly supports application of the immunity to witnesses of unique fact or opinion who are otherwise unrelated to the litigation, it does not necessarily contemplate the situation of a professional who voluntarily agrees to assist a party in the litigation process for compensation.

■ Witness immunity, often referred to as a privilege, originated in defamation law. The law of defamation divides privileges into two general classes: (1) that which is qualifiedly or conditionally privi-

leged, and (2) that which is absolutely privileged. *Laun*, 166 S.W.2d at 1068. Absolute privilege is considered "absolute" because it immunizes a witness from liability in a subsequent defamation action even if the witness' statements were made with malice. Qualified or conditional privilege grants immunity only if the statements were made in good faith. *Id., citing* 22 Mich.L.Rev. 437; 1 Cooley, *Torts*, p. 525.

### B.

Although early English cases characterized witness immunity as absolute, the privilege did not immunize witnesses from absolutely every cause of action. The Supreme Court in *Briscoe v. LaHue,* 460 U.S. at 331, 103 S.Ct. at 1113, referred to three English common law cases, which are generally cited as the seminal cases establishing the doctrine of witness immunity: *Cutler v. Dixon,* 4 Co.Rep. 14b, 76 Eng.Rep. 886 (Q.B.1585); *Anfield v. Feverhill,* 2 *Bulst.* 269, 80 Eng.Rep. 1113 (K.B.1614); and *Henderson v. Broomhead,* 4 *H & N* 569, 157 Eng.Rep. 964, 968 (Ex.1859). These cases reveal that the immunity originated within the limited context of defamation law.

*Cutler,* the oldest case, held that allegations made by a plaintiff "in articles of the peace exhibited to justices" were not actionable because they were part of a "proceeding in the course of justice." 76 Eng. at 887. The court reasoned that if such actions should be permitted, then "those who have just cause for complaint, would not dare to complain for fear of infinite vexation." *Id.* at 888. Although the language of *Cutler* did not explicitly limit the immunity to defamation cases, later English cases clearly establish its narrow applicability.

*Anfield* held that an adverse party could not bring a subsequent action for libel for evidence presented by a party against him in a prior action. 2 *Bulst.* 269. Similarly, in *Henderson,* a party in a prior case was held immune from suit by an individual, not a party in the original suit, for an allegedly false and malicious statement filed in an affidavit. The court held "[a]n action will not lie for defamatory words spoken in the course of litigation." The court found the doctrine to exist "from the earliest times" and "extending over many centuries." 4 *H. & N.* at 577–8.

Subsequently, witness immunity was adopted by several states in this country in substantially the same manner as in England. Early American decisions restricted witness immunity to the confines of defamation actions. The privilege immunized witnesses from liability in subsequent libel actions regardless of the witness' malice. *Sebree v. Thompson,* 126 Ky. 223, 103 S.W. 374 (1907); *Hunckel v. Voneiff,* 69 Md. 179, 14 A. 500 (1888), 69 Md. 179, 17 A. 1056 (1889); *Cooley v. Galyon,* 109 Tenn. 1, 70 S.W. 607 (1902).

Some American jurisdictions, however, not only limited the scope of witness immunity to defamation actions but narrowed its applicability even more. These courts made a distinction between statements that were volunteered in the prior proceeding and statements made in response to questions asked by counsel or the court. If the statements were simply volunteered by the witness, then the witness had to believe the statements were relevant in order for them to be privileged. *Wright v. Lathrop,* 149 Mass. 385, 21 N.E. 963 (1889); *Weil v. Lynds,* 105 Kan. 440, 185 P. 51 (1919). In *Wright,* the Supreme Court of Massachusetts held:

> The examination of witnesses is regulated by the tribunal before which they testify, and if witnesses answer pertinently questions asked them by counsel which are not excluded by the tribunal, or answer pertinently questions asked them by the tribunal, they ought to be absolutely protected. It is not the duty of the witness to decide for himself whether the questions asked him under the direction of the tribunal are pertinent or not.... But a witness ought not be permitted with impunity to volunteer defamatory statements which are irrelevant to the matter of inquiry, and which he does not believe to be relevant.

21 N.E. at 965. The Supreme Court of Kansas held that if the witness volunteered irrelevant statements, "[then] he enjoys

but a qualified privilege, depending upon whether or not he acted in good faith and believing the matter to be pertinent as well as true." *Weil,* 185 P. at 52.

### C.

Similarly, Missouri placed more restrictions on the applicability of witness immunity than most of the English cases.[1] Our early decisions required that all of the witness' statements be relevant to the proceeding without distinguishing between volunteered and responsive statements. In addition, the court in the prior proceeding had to have jurisdiction in order for the witness to enjoy absolute immunity from subsequent defamation actions.[2] *Hager,* 186 S.W.2d 564; *Laun,* 166 S.W.2d 1065; *Jones,* 61 S.W. 795; *Hyde,* 13 S.W. 875.

The first Missouri case addressing the issue of witness immunity appears to be *Hyde v. McCabe,* 13 S.W. 875. There, a suit was permitted against a witness for statements made in an earlier proceeding. The suit was brought by a nonparty concerning allegedly libelous matters contained in an affidavit filed by one of the parties' attorneys. Without citation to any specific authority, the Court held:

> The general rule is that an affidavit filed in the course of judicial proceedings is not actionable as libelous if fairly relevant to the issue, or responsive to some fact apparently bearing on the issue to which it is directed, assuming, of course, that the court has jurisdiction in the premises. If an irrelevant charge, otherwise libelous, is contained in such affidavit, it may be the basis of an action for libel if shown to have been maliciously made, without an honest belief that it was relevant to the issue, based upon reasonable grounds for such belief.

*Id.,* 13 S.W. at 876. The Court then found that the defamatory matter in question was not sufficiently relevant to the proceeding and remanded the case for trial.

The next significant Missouri case concerning witness immunity was *Jones v. Brownlee,* 61 S.W. 795. This was also a libel case where plaintiff brought suit against a defendant, Mrs. Brownlee, for her statements in a prior divorce action. In the divorce proceeding, Mrs. Brownlee alleged that her husband consorted and cohabited with the plaintiff. The Court found that while the English common law provided an absolute privilege for parties to a civil action regarding defamation, in America the privilege was absolute only if the court had jurisdiction and the statements were relevant. If one of those two requirements were lacking, the witness only enjoyed a qualified or conditional privilege, which could be vitiated by establishing malice. *Id.,* 61 S.W. at 796. In *Jones,* however, the allegedly libelous remarks were relevant. Therefore, the presence of malice was irrelevant and the suit was dismissed.

In *Laun v. Union Electric,* 166 S.W.2d 1065, the Court again recognized the doctrine of witness immunity but refused to extend it to the defendants. The defendants provided allegedly false information to two individuals who incorporated the information into an amended complaint filed in federal district court against plaintiff. The decision devoted much of its analysis to the balancing of one's right to reputation as an "absolute right, to be repeated at peril," and the public interest of permitting "freedom of speech where it is essential that freedom of speech should exist." 166 S.W.2d at 1068, 1071, quoting from Veeder's "The History of Defamation" and "Absolute Immunity in Defamation," 3 Col. L.Rev. 547; 9 Col.L.Rev. 463. The Court

---

1. *Henderson v. Broomhead,* 4 *H & N* 569, also required that the statement be "relevant to that litigation" for the immunity to apply. This element apparently was not required in other English cases.

2. One of our earlier decisions held that where the prior case was dismissed, it must be specifically alleged that the dismissal was for lack of jurisdiction in order to defeat the defense of witness immunity in the subsequent action. *Hager v. Major,* 353 Mo. 1166, 186 S.W.2d 564 (1945).

refused to absolutely immunize the defendants:

> We find no reason or principle of public policy demanding extension of the doctrine to those who are alleged to have procured the publication of the libelous matter by others who were privileged to do so because they were parties to the litigation. The present defendants may not take advantage of the privileged occasion because they are not in character as parties or pleaders to that privileged occasion or instance. When absolutely privileged publication is claimed it must appear that "The publication, * * * as Lord Mansfield said, be made 'in office'; in other words, it must be made in the character of judge, juror, witness, litigant, or counsel, in the performance of the public duty or in the exercise of the private right upon which the immunity is based." 9 Col.L.Rev. 463, 490.

*Id.*, 166 S.W.2d at 1071. Instead, the Court held that plaintiff could recover if he proved the defendants' statements were not in good faith but instead willfully and knowingly used for the purpose of defamation. *Id.*, 166 S.W.2d at 1073.

*Remington v. Wal–Mart Stores, Inc.*, 817 S.W.2d 571 (Mo.App.1991), is a more recent Missouri case addressing witness immunity. In *Remington*, a former employee filed suit for tortious interference with business expectancy against her employer, Wal–Mart. Wal–Mart filed a letter of protest in an unemployment compensation proceeding regarding the plaintiff. The court found that Wal–Mart was protected by witness immunity. Although the plaintiff filed suit for tortious interference with business expectancy, the court did not necessarily extend the scope of witness immunity outside the context of defamation law. The court noted that plaintiff's peti-

tion pled all the facts necessary to state a cause of action in libel. Consequently, the court held that she could not circumscribe Wal–Mart's privilege by recharacterizing her cause of action in nondefamatory terms.

In each of the Missouri cases, the court applied the doctrine of witness immunity narrowly. Every decision was limited to subsequent actions in defamation or defamation-type lawsuits. Even within the context of defamation, absolute immunity applied only if the statements made were relevant and the court had jurisdiction. Otherwise, the witness only enjoyed a qualified immunity. In addition, all of our prior decisions immunized statements made directly in the judicial proceeding itself or in an affidavit or pleading, and all of the statements were made by adverse witnesses or parties.

■ The present case is outside the realm of defamation. It does not involve an adverse witness and Murphy's claim is limited to litigation support services, not testimony. As the *Laun* decision demonstrates, immunity is granted in very limited situations only when the underlying public policy considerations so demand. Our previous decisions do not address whether the underlying policy considerations of witness immunity justify its extension to the present situation. Because so few other jurisdictions have confronted this issue, there is very little guidance.

### III.

Only four other jurisdictions have been found that have addressed this precise issue: Washington, New Jersey, Texas, and California.[3] Washington extended the immunity to expert witnesses. New Jersey, Texas and California, each expressing differing reasons, did not.

---

**3.** Other jurisdictions have considered cases involving subsequent actions against expert witnesses. Unlike the case at bar, in those cases the experts testified as *adverse* witnesses in the prior proceeding. Such situations are more similar to the general rule protecting adverse witnesses from harassment type defamation suits. The decisions do not address a party bringing suit against his or her own expert. *Kahn v. Burman,* 673 F.Supp. 210, 213 n. 1 (Mich.1987) (specifically stating that its holding

was limited to adverse expert witnesses and did not address whether immunity would be appropriate if the malpractice plaintiff were suing his own expert witness for negligence); *Western Technologies, Inc. v. Sverdrup & Parcel, Inc.,* 154 Ariz. 1, 739 P.2d 1318 (App.1978); *Wright v. Yurko,* 446 So.2d 1162 (Fla.App.1984); *Moity v. Busch,* 368 So.2d 1134 (La.App.1979); *Middlesex Concrete Products and Excavating Corp. v. Carteret Indus. Ass'n.,* 68 N.J.Super. 85, 172 A.2d 22 (App.Div.1961).

In *Bruce v. Byrne–Stevens & Associates Engineers, Inc.,* 113 Wash.2d 123, 776 P.2d 666 (1989), two plaintiffs sued their neighbor who performed excavation work on his property resulting in a loss of lateral support for plaintiffs' soil. The plaintiffs retained Byrne–Stevens to calculate and testify as to the cost of stabilizing the soil on their land. Plaintiffs won their suit against the neighbor, and the court awarded the sum calculated by Byrne–Stevens. However, the cost of restoring lateral support later proved to be double the amount of Byrne–Stevens' estimate. Plaintiffs then brought suit against Byrne–Stevens for negligence.

A divided court held that plaintiffs' suit was barred by witness immunity.[4] Dismissing an argument that witness immunity only applies to defamation actions, the court found the scope of witness immunity very broad. The decision focused on the chilling effect of the threat of subsequent litigation. Without immunity, the plurality wrote, it would be difficult to get experts to testify. Moreover, experts might shade their testimony to avoid subsequent liability. The court dismissed the professional's duty to the client and role as an advocate. The court explained that the basic policy of ensuring "frank and objective testimony" remains regardless of how the witness comes to court. "As a matter of law," the court wrote, "the expert serves the court." *Id.,* 776 P.2d at 669.

The plurality then found that the immunity should extend beyond the courtroom to pretrial preparation services forming the basis of the expert's testimony. The court reasoned the testimony and the acts on which it is based are too difficult to distinguish. Therefore, to avoid the adverse chilling effects of subjecting witnesses to liability, the entire process should fall within the scope of the immunity. Despite the broad application of the immunity, howev-

er, the plurality assumed that the judicial process itself provides safeguards against false or inaccurate testimony. "A witness' testimony is ensured by his oath, the hazard of cross-examination and the threat of prosecution for perjury." *Id.,* 776 P.2d at 667.

The dissent in *Byrne–Stevens* argued that the immunity related primarily to defamation cases and should not be extended. It noted that unlike an independent or adverse witness, the privately retained expert owes a duty to the client. The dissent also argued that the professional's malpractice outside the courtroom should not be immunized merely because the professional subsequently publishes his or her opinion in a court of law at the client's request. *Id.,* 776 P.2d at 674. Moreover, the dissent argued, the oath of a witness and cross-examination do not protect the client from the experts' unintentional negligence or matters that the adversary chooses, most probably in his or her self interest, not to contest. *Id.,* 776 P.2d at 675.

The Supreme Court of Texas addressed this issue in *James v. Brown,* 637 S.W.2d 914 (Texas 1982). In *James,* the underlying action involved a hearing regarding plaintiff's mental competency. The plaintiff thereafter sued three doctors who testified at the hearing that she was incompetent. The court dismissed the plaintiff's libel action based upon the generally accepted common law privilege.[5] The court, however, expressly rejected a blanket immunity from all civil liability for psychiatrists testifying in mental health proceedings. Instead, the court held that although the doctors' communications to the court were shielded, the plaintiff could pursue the other remedies at law also alleged in the suit. Simply because the doctors' diagnoses were later communicated to a court in a judicial proceeding, the court explained, did not prevent the plaintiff from

---

**4.** Four judges concurred in an opinion with another concurring in result only. Four judges concurred in a dissenting opinion. *Id.,* 776 P.2d at 673.

**5.** The court cited the *Restatement (Second) of Torts* § 588 (1981), which provides:

A witness is absolutely privileged to publish defamatory matter concerning another in communications preliminary to a proposed judicial proceeding or as a part of a judicial proceeding in which he is testifying, if it has some relation to the proceeding.
*James v. Brown,* 637 S.W.2d at 917.

recovering for negligent misdiagnosis-medical malpractice. *Id.*, 637 S.W.2d at 918.

*James* hinged on a Texas statute that provided immunity to persons who *without negligence* perform examinations and other acts required by the Texas Mental Health Code. The court found that the statute created a "plain implication" that a cause for negligence would exist. In turn, it has been noted that the following language of the case implies that the court's decision might not be limited solely to the statute: [6]

> While the doctors' communications to the court of their diagnoses of Mrs. James' mental condition, regardless of how negligently made, cannot serve as the basis for a defamation action, the diagnoses themselves may be actionable on other grounds.... The unavailability of a defamation action does not preclude a plaintiff from pursuing other remedies at law.... Mrs. James is not prevented from recovering from the doctors for negligent misdiagnosis-medical malpractice merely because their diagnoses were later communicated to a court in the due course of judicial proceedings.

*Id.*, 637 S.W.2d at 917–18.

In *Levine v. Wiss & Co.*, 97 N.J. 242, 478 A.2d 397 (1984), the New Jersey Supreme Court considered whether a husband could bring an action against a court-appointed accountant and accounting firm for negligence in valuing a business asset to be divided in a divorce proceeding. The defendants claimed that they were arbitrators, not accounting expert witnesses, because they were court-appointed and the litigants agreed that the valuation would be binding. Therefore, they argued, they were serving in a quasi-judicial capacity and should be shielded by judicial immunity from negligence actions. *Id.*, 478 A.2d at 399.

The court disagreed. It found that the defendants served pursuant to an agreement between the parties merely approved by the court. The court explained that the defendants were compensated by the parties and functioned as appraisers. Moreover, the court also found that the defendants were engaged because of their special knowledge, technical skill and expertise to act as "appraisers" in the dispute, rather than as "arbitrators," in whose hands the dispute resolution was entrusted. *Id.*, 478 A.2d at 400. Therefore, the standard of reasonable care used for most professionals was held to be applicable.

A recent case addressing this issue was decided in California. *Mattco Forge, Inc. v. Arthur Young & Co.*, 5 Cal.App.4th 392, 6 Cal.Rptr.2d 781 (1992). The case arose out of litigation between Mattco and General Electric. Mattco engaged Arthur Young to perform litigation support accounting work calculating estimated lost profits. In the underlying suit, the court dismissed Mattco's complaint as a sanction for fraudulent conduct involving litigation-related work performed by Arthur Young. Thereafter, Mattco filed suit against Arthur Young for breach of contract and negligence regarding the litigation-related work.

Arthur Young raised as a defense a California statute providing immunity for judicial proceedings. Section 47(b), California Civil Code. The California statutory privilege extends to attorneys, judges, witnesses, and other court personnel. The court explained that the statute was premised on three fundamental policies. First, it affords litigants free access to the courts to secure and defend their rights to testify truthfully without fear of subsequent civil liability. Second, it prevents the proliferation of lawsuits after the first one is resolved. Third, the privilege facilitates crucial functions of the trier of fact. *Id.*, 6 Cal.Rptr.2d at 787.

After considering these policies, the court held that the statute did not bar the lawsuit. The court distinguished neutral third-party witnesses and experts hired expressly to assist in the preparation of a case for trial. It found that immunizing experts chills access to the courts by making the party bear the loss for the expert witness' negligence. The court also noted that the immunity was not established to protect one's own expert, but to protect witnesses from harassment claims from adverse litigants. Finally, the court conclud-

---

**6.** 26 Willamette L.Rev. 1051, 1071 (1990).

ed, the trial process cannot correct witness error in situations where the case does not reach trial. *Id.*, 6 Cal.Rptr.2d at 788–9.

### IV.

■ We do not find the reasoning of the *Byrne–Stevens* plurality persuasive. Instead, like the decisions in *James, Levine, Mattco Forge,* and the *Byrne–Stevens* dissent, we do not find that the underlying policy considerations of witness immunity justify its extension to this situation.

■ Witness immunity is an exception to the general rules of liability. It should not be extended unless its underlying policies require it be so. *Laun,* 166 S.W.2d at 1069. In Missouri, this immunity generally has been restricted to defamation, defamation-type, or retaliatory cases against adverse witnesses. This narrow restriction is consistent with the historical development of immunity.

While witness immunity might properly be expanded in other circumstances, we do not believe that immunity was meant to or should apply to bar a suit against a privately retained professional who negligently provides litigation support services.[7] We hold that American's claim against Mathews for negligent pretrial litigation support services is not barred by witness immunity.

Because *Byrne–Stevens* was the only case to extend immunity to a suit for damages arising from the alleged negligence of a party's litigation support professionals, it may be helpful for us to respond to certain of its primary arguments. *Byrne–Stevens* broadly interpreted the United States Supreme Court decision of *Briscoe v. LaHue,* 460 U.S. 325, 103 S.Ct. 1108. It interpreted *Briscoe* as establishing a single immunity

for all participants involved in a judicial proceeding:

> The various grants of immunity for judges and witnesses, as well as for prosecutors and bailiffs, are all particular applications of a central policy [the need to preserve and enhance the judicial process]. They are best described as instances of a single immunity for participants in judicial proceeding.

776 P.2d at 668. The *Byrne–Stevens* court reasoned that "[t]he mere fact that the expert is retained and compensated by a party does not change the fact that, as a witness, he is a participant in a judicial proceeding. It is that status on which immunity rests." *Id.*, 776 P.2d at 669.[8] We do not find that *Briscoe* should be read so broadly.

*Briscoe* addressed whether 42 U.S.C. § 1983 permits damages to be recovered from a police officer for giving allegedly perjured testimony at a defendant's criminal trial. The Court found that the police officer was immune. The reasoning of the Court rested primarily on the function of the police officer as a witness rather than the occasion of the judicial proceeding.[9] That case was very different than the present case. There, the police officer was acting as an adverse witness and testifying as to facts allegedly within his own particular knowledge. Clearly, there would be an adverse chilling effect on free testimony, and great disruption to our criminal justice system, if officers were not immune from suits for their testimony.

The function of providing expert litigation services is wholly different from the function of a police officer as analyzed in *Briscoe.* These experts do not usually act

---

**7.** Plaintiff's allegations are limited to pretrial preparation work and do not go to trial testimony. The factual context of this case allows for a relatively clear separation of these functions. Accordingly, our decision is limited to pretrial, litigation support activities and does not reach the issue of whether suit would be barred as to actual trial testimony.

**8.** To the extent that *Byrne–Stevens* implies that an expert is entitled to greater immunity than an ordinary witness because the expert must be accepted by the court, we disagree. The court does not select, define the scope of work, or

compensate the expert. In ordinary circumstances, the party does. The court merely determines whether the professional may state an opinion in evidence. To find that a normal expert witness is more of an agent of the court than an agent of the litigant who hired the expert ignores the practical realities of the two relationships.

**9.** The "functional approach" for determining immunity was established by the Supreme Court in a previous decision. *Butz v. Economou,* 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978).

solely as witnesses, but perform substantial pretrial work. Also, unlike the police officers, experts retained by one party voluntarily assume a professional duty to their client in exchange for direct monetary remuneration. Their advice is used to help their client make his or her case more persuasive. They function as paid advisors and as paid advocates.

It cannot be denied that *Briscoe* contains some broad language. However, it does not clearly evidence an intention to abandon the historical underpinnings of the doctrine of witness immunity and allow it to be expanded to cases such as this.

The *Byrne–Stevens* decision found that witness immunity should apply to experts in order to "preserve the judicial process by encouraging full and frank testimony." 776 P.2d at 667. The court found that "it is immaterial that an expert is retained by a party" because "the basic policy of ensuring frank and objective testimony obtains regardless of how the witness comes to court." *Id.*, 776 P.2d at 669. The court cited *Kahn v. Burman*, 673 F.Supp. 210, for this proposition. *Kahn*, however, involved a suit against an adverse party's expert witnesses and is not applicable. *See* footnote 3.

Due to the hired expert witness' function, we do not believe that the policy of ensuring frank and objective testimony is furthered by granting immunity. In most circumstances, these experts possess no independent factual knowledge concerning the litigation. Instead, they are usually retained to assist a party in preparing and presenting its best case in exchange for a fee. In practice, they function as professionals selling their expert services rather than as an unbiased court servant. Thus, immunizing an expert retained and compensated for providing litigation support services does not advance this underlying policy.

We also do not believe that the threat of liability will encourage experts to take extreme and ridiculous positions in favor of their clients in order to avoid a suit by them. Rather, imposing liability would encourage experts to be careful and accurate. They are liable if they perform their service negligently. Certainly these professional individuals are subject to liability in any of their other work if they fail to comply with the degree of care, skill and proficiency commonly exercised by ordinarily skillful, careful and prudent professionals and if their failure to do so causes injury to their client. The fact that this particular service may be related to litigation should not bar their clients this protection.

Another policy consideration raised by *Byrne–Stevens* concerned the difficulty in retaining experts if the experts were not protected. We do not believe that litigants will be unable to retain experts to help prepare claims and present testimony. Professionals have been subject to liability outside this context for many years, and they have continued to provide these non-litigation related services. Litigation support services have turned into big business, with direct mail solicitation and advertisement in bar and other publications being common. There is no reason to believe that professionals will abandon the area of litigation support merely because they will be held to the same standard of care applicable to their other areas of practice.

The *Byrne–Stevens* decision also argued that allowing suits against privately retained expert witnesses might restrict access to the courts. To the extent that this argument is merely a reframing of the argument that professionals might not be willing to provide these services if they are held accountable for their negligence, we have already indicated the reasons for our disagreement. We also agree with the analysis set forth in *Mattco Forge* that it is the immunization itself, not the lack of immunity, that would provide the greatest and most direct restriction against the pursuit of claims for injury.

*Byrne–Stevens* does correctly point out that failure to apply the immunity to those providing expert litigation services may lengthen the litigation process for yet one more lawsuit. However, we allow just the same for malpractice actions against trial attorneys, and the analogy between the services provided by these two types of

professionals suggests consistent, not inconsistent, treatment.[10]

Our decision is based primarily upon the commercial relationship assumed by the professional and his or her role as an advocate.[11] Expert witnesses have taken on a growing role in modern litigation. Not only do they testify in more and more cases, but they also play a substantial role in case preparation. Often they play as great a role in the organization and shaping and evaluation of their client's case as do the lawyers. Those who provide these services are selected for their skill and ability and are compensated accordingly just as any other professional. More often than not, their role is as an advisor and advocate as opposed to an objective and independent witness. We find no reason or principle of public policy justifying the extension of witness immunity to professionals retained for litigation support services.

### V.

In short, Mathews was not an independent fact or opinion witness with information to be presented to the court in an objective manner. Mathews agreed to provide its expert services to American to assist it in the preparation of its claims. Mathews voluntarily agreed to provide these services and thereby also to assume the duty of care of a skillful professional in exchange for a $350,000 fee. American alleges that Mathews was negligent in providing these services and that damages resulted. We do not believe that witness immunity should bar such a suit. Accordingly, the judgment is reversed and the cause remanded.

10. Mathews also has argued that this claim is barred by collateral estoppel, sometimes referred to as issue preclusion. However, collateral estoppel only precludes relitigation of an issue "identical with the issue presented." *Oates v. Safeco Ins. Co. of America*, 583 S.W.2d 713, 719 (Mo.1979). The issue of Mathews' alleged negligence and resulting damages to American was not previously litigated. *See also Calhoun v. Lang*, 694 S.W.2d 740, 742 (Mo.App.1985).

11. Our holding would not subject adverse expert witnesses to malpractice liability because, in that situation, the expert owes no professional duty to the adversary. Neither would it expand the liability of an expert with independent factu-

ROBERTSON, C.J., COVINGTON, HOLSTEIN, BENTON and THOMAS, JJ., and BRECKENRIDGE, Special Judge, concur.

LIMBAUGH, J., not sitting because not a member of the Court when case was submitted.

al knowledge or a previous connection to the case, such as a treating physician. In such cases, the professional would already be subject *to liability if the services provided failed to meet* the requisite standard of care. Unless additional duties were agreed to regarding services related to the lawsuit itself, merely reimbursing a witness for the lost time required to testify would not in and of itself evidence any agreement to justify an additional legal duty. Neither would it apply to an expert retained by the court independent of the litigants.