Kottmyer, J.
INTRODUCTION
Plaintiff, Karen Boyes-Bogie (“Boyes-Bogie”), brought this action for negligence, breach of contract and malpractice against, among others, defendant Joel Horvitz, d/b/a/ Joel R. Horvitz & Associates. Horvitz, an expert in business valuations, was retained to provide litigation services to Boyes-Bogie in connection with a pending divorce action. Horvitz has moved for summary judgment on all claims against him on the grounds that he has absolute immunity. For the reasons set forth below, Horvitz' motion for summary judgment is denied.
SUMMARY JUDGMENT RECORD
The undisputed facts and disputed facts viewed in the light most favorable to Boyes-Bogie are as follows. In October 1994, Boyes-Bogie retained Attorney Kenneth Soble of Soble, VanDam, Pearlman & Gittlesohn to represent her in a divorce action against her husband Andrew Rogal (“Rogal”). A major marital asset was stock of Rogal America, Inc. (“RAI”). Rogal owned 100% of the RAI stock.
In March of 1995, Soble, acting on behalf of BoyesBogie, retained Horvitz to provide expert litigation support and testimony relating to the valuation of the RAI stock and Rogal’s 100% ownership interests in RAI and a related corporation.[1] Horvitz, a certified public accountant, had previously qualified as an expert in business valuations in the Probate and Family Court. On or about March 20, 1995, the parties executed an engagement letter drafted by Horvitz. Horvitz agreed “to perform a review of the accounting records and other related data of [RAI and a related company] in order to determine the fair market value of the corporate stock and Andrew Rogal’s 100% ownership interests.” Horvitz estimated that his fees for the engagement would be in the range of $6,000 to $7,500, exclusive of formal report and trial preparation and testimony. He requested and received a retainer of $6,500. In the engagement letter, Horvitz stated: “We will always be available for consultation and questions, and all necessary telephone calls are encouraged.” Boyes-Bogie agreed to compensate Horvitz for his services at the rate of $ 165 per hour for “noncourt time” and $175 per hour for court time, including preparing to testify and testifying.
Soble sent a series of letters to Horvitz requesting progress reports. On September 28, 1995, he requested by facsimile and mail a progress report on the appraisals. He referred to “personal problems” on the part of Horvitz, which may have caused delays and stated “but your attention to this matter and failure to keep me advised of any progress is extremely questionable.” He continued:
I can go no further without your assistance. If you are unable to professionally perform your services in a more timely manner, perhaps you should reevaluate whether you should so advise me and appropriately withdraw so I can retain someone to complete this much needed information.
Soble noted that Horvitz had canceled the last three appointments he had made at RAI and asked him to give the matter his immediate attention. Soble again wrote to Horvitz on October 25, 1995. He noted that Horvitz had not responded to his previous communications, described ongoing settlement negotiations and asked Horvitz to give him “some parameters regarding an appraisal” which would assist him “in getting to work towards a settlement.” Soble concluded:
I have been most patient, as you know, and I have tried to be sensitive to your personal problems, but it is now affecting a number of people and I must ask that you respond accordingly to the above as soon as possible. I implore you to give this matter your immediate attention.
*209 On November 20, 1995, Soble sent a letter to Horvitz by facsimile stating: “I must have a letter with the parameters of the appraisal we discussed by the end of the week.” On November 30, 1995, Soble sent another letter by facsimile. Soble stated that he was sympathetic to Horvitz’ personal problems, and continued:
I certainly don’t mean to threaten you but in the alternative you are leaving me with little opportunity to do otherwise. I need that letter appraisal no later than Tuesday, December 5, 1995. In the event that I do not have what we agreed upon which is minimal to what you were hired to produce, I will have to seek the appropriate recourse which will be unpleasant for both of us. I urge you Joel to take the time and assert every effort to complete this limited task. Please don’t force me to have to report this matter which will be painful for you and extremely unpleasant for me. I regret having to write you in this manner but you are leaving me no alternative.
(Emphasis in original.)
Horvitz delivered a typed report to Soble on December 1, 1995.[2] In the report Horvitz stated that his objective was "to determine the current fair market value of Rogal America, Inc. and Andrew Rogal’s 100% ownership interest.” He concluded that ”[t]he results of all my analysis is a $2,989,500 gross value of the business and a $2,093,000 net value after discounts attributed to Mr. Rogal’s 100% interest.” The case did not go to trial. On April 12, 1996, Boyes-Bogie and Rogal entered into a Settlement Agreement. Horvitz was paid $7,500 for his services in the case. Horvitz did not comply with the applicable professional standards in valuing RAI and substantially understated the value of Rogal’s ownership interest. (Sheeler Aff. ¶¶9 through 14.)[3] Boyce-Brice relied on Horvitz’ valuation when she agreed to the settlement.
DISCUSSION
The narrow issue presented by this motion is whether the doctrine of witness immunity protects a privately retained professional who negligently provides litigation support services from liability in a case brought by the individual who retained the expert. There is no Massachusetts authority directly on point.[4]
Courts have consistently held that the witness immunity doctrine protects an expert witness from suit by an adverse party. But the majority of courts which have considered the issue in cases analogous to the present case have held that the doctrine does not protect an expert witness from a claim of negligence by the party who retained the expert to provide litigation support services. Murphy v. A.A. Mathews, A Division of CRS Group Ingenous, Inc., 841 S.W.2d 671, 672 (Mo. 1992) (en banc) (witness immunity did not bar negligence action brought against engineering firm by party which retained the firm to provide pretrial litigation support services);[5] Mattco Forge v. Arthur Young & Co., 6 Cal.Rptr.2d 781, 783 (Cal.Ct.App. 1992) (privilege did not protect accounting firm retained to provide litigation support services from suit for malpractice by party which retained the firm where case was dismissed before trial as a result of rulings resulting from the alleged malpractice and expert did not testify); LLMD of Michigan, Inc. v. Jackson-Cross Company, 559 Pa. 297 (1999) (witness immunity doctrine did not apply where expert’s testimony on lost profits was stricken when he was unable to recalculate lost profits while on the witness stand by correcting a mathematical error disclosed during cross examination and case then settled);[6] Pollock v. Panjabi, 27 Conn. L. Rptr. 16, 2000 WL 739639 (Conn. Super. Ct. May 17, 2000) (witness immunity did not bar negligence action against expert retained by party whose testimony was excluded based on Court’s determination after a series of pretrial hearings that experiment was not properly conducted).
In only one state has the highest court held that expert witnesses are immune from liability to the individual who retained the expert.[7] In Bruce v. ByrneStevens & Assocs. Eng’rs, Inc., 776 P.2d 666, 667 (Wash. 1989), a plurality of the Washington Supreme Court held that witness immunity barred a malpractice suit by plaintiffs against an expert they had retained to calculate the costs of corrective work. Four judges concurred in the opinion, with a fifth judge concurring in the result only, and four judges dissented. The engineer had testified as an expert in the underlying case and plaintiffs in the malpractice action were awarded damages based on the expert’s testimony. Actual costs were twice the amount estimated by the engineer and the plaintiffs sued for malpractice. The Court held that immunity extended to pretrial preparation services forming the basis of the expert’s testimony.
The plurality in Bruce focused on the chilling effect that the threat of subsequent litigation would have on the expert’s testimony. According to the Court, a loss of objectivity would result because experts would be encouraged to assert the most extreme position favorable to the party for whom they testify. Id. at 670. Moreover, imposition of civil liability on expert witnesses would discourage anyone who is not a professional expert witness from testifying because only professional witnesses will be in a position to carry insurance covering such liability. Id.
Like other courts which have considered the issue, I do not agree with the reasoning of the plurality in Bruce that the prospect of civil liability for malpractice will discourage frank and objective testimony by experts. First, it ignores the reality that, by definition, expert witnesses retained by a party are not objective witnesses. They have no personal knowledge of the facts of a case. They are retained by a party to assist *210 that party in advocating its position. Moreover, the existence of liability will, in my view, encourage experts to be more careful and thorough resulting in more accurate, reliable testimony. The potential for liability will enhance the judicial process “by requiring that the expert witness render service to the degree of care, skill and proficiency commonly exercised by the ordinarily skillful, careful and prudent members of their profession.” LLMD, supra, 740 A.2d at 191. Compare Comins v. Sharkansky, supra, 38 Mass.App.Ct. at 41 (expert accountant charged with furnishing skilled services for compensation was not entitled to be relieved from liability for failure to meet standards on the ground of quasi-judicial immunity).
The second factor relied on by the plurality in Bruce, that potential civil liability will affect the willingness of experts who are not “professional witnesses” to provide litigation support services, is more troublesome. Individuals who are academicians, researchers or otherwise professionally active in their fields and who do not regularly provide litigation services, but agree to serve as an expert in a given case make a significant contribution to the justice system. Their agreement to serve is more likely to be based on, and result in, an objective application of the governing principles to the relevant facts than is the agreement to provide such services by one who makes his living providing litigation support services. Although this issue could presumably be addressed by contract, the prospect of liability may well hamper the ability of the parties to secure the litigation services of an expert who does not derive a significant portion of his income from providing such services. Balanced against this consideration is the fact that witness immunity is “an exception to the general rules of liability, [and] . . . should not be extended unless its underlying policies require it be so.” Murphy, supra. 841 S.W.2d at 680. Moreover, the negligent expert would enjoy immunity at the expense of the right of the party who hired and paid the expert to enforce its contractual right to competent work. See Mattco, supra, 5 Cal.App. 4th at 404 (“Applying the privilege where the underlying suit never reached the trial stage would mean that the party hiring the expert witness would have to bear the penalty for the expert witness’ negligence”).
CONCLUSION
For the reasons stated herein, I rule that the doctrine of witness immunity does not bar a claim for negligence against an expert privately retained to provide litigation support services by the party who retained the expert in circumstances of this case. The defendant Horvitz’ motion for summary judgment is denied.

 Rogal retained a certified public accountant, Walter Gold-stein, for the same purpose.

 He had delivered a handwritten version of the report one or two days earlier.

 Boyes-Bogie relies on the fact that on May 22, 1996, Rogal's accountants, Starr Finer and Staff, opined that the capitalized value of Rogal was $8.5 million. There is no such evidence in the summary judgment record.

 It is established that witnesses are immune from claims for defamation and that the absolute privilege extends to statements made in the institution or conduct of litigation or in conferences and other communications preliminary to litigation. See Correllas v. Viveiros, 410 Mass. 314, 320 (1991) (“Statements made by a witness or party during trial, if ‘pertinent to the matter in hearing,’ are protected with an absolute privilege against an action for defamation"); Dolan v. Von Zweck, 19 Mass.App.Ct. 1032, 1033 (1985) (letter concerning proposed expert testimony in child custody case was privileged). In addition, the doctrine of judicial immunity has been extended to persons, other than judges, performing judicial or quasi-judicial functions. Lalonde v. Eissner, 405 Mass. 207, 211-13 (1989) (court-appointed psychiatrist who renders expert services to the court is entitled to immunity in the performance of those services). Compare Coming v. Sharkansky, 38 Mass.App.Ct.27 (1995) (certified public accountant selected by the parties to perform a binding appraisal of stock pursuant to a court-approved settlement agreement was not entitled to absolute immunity as a quasi-judicial officer in an action alleging negligence). Accord Levine v. Wiss & Co., 478 A.2d 397 (1984) (accountingfirm selected and paid by parties and appointed by the court pursuant to agreement of the parties to act as an impartial expert to value a business asset included in the marital estate were not arbitrators entitled to quasi-judicial immunity).

 Although Murphy involved an arbitration proceeding and not a trial, the Missouri Supreme Court framed the issue as whether “immunity should be extended to bar malpractice claims against professionals hired to perform litigation support services.” 841 S.W.2d at 674. The Court did limit its holding to pretrial litigation preparation work. “[0]ur decision is limited to pretrial litigation support activities and does not reach the issue of whether suit would be barred as to actual trial testimony.” Id. at 680, n. 7.

 The majority in LLMD of Michigan, Inc. distinguished a prior Superior Court case, Panitz v. Behrend, 429 Pa.Super. 273 (1993), allocatur denied, 539 Pa. 694 (1994), on the grounds that Panitz involved a claim predicated on “the substance” of the expert’s opinion, whereas the instant case a claim of negligence in formulating the opinion. Id. at 674. The dissent pointed out that the line proposed by the majority was unworkable because there is no “bright line” between what constitutes an attack on the substance of an opinion and a challenge premised on the expert’s negligence in forming the opinion. Id. at 308.

 Provencher v. Buzzell-Plourde Associates, 142 N.H. 848, 711 A.2d 251 (1998), on which Horvitz relies, is notapposite. In that case, the expert appraiser was retained by the state in connection with a contemplated eminent domain proceeding pursuant to an agreement between the parties that if they were not able to agree as to the value of the property, suit would be brought. The state made an offer based on the expert’s valuation and the expert testified for the state. The case thus involved suit against an adverse witness. Horvitz also relies on Marrogi v. Howard, 248 F.3d 382 (5th Cir. 2001). There, the Court of Appeals for the Fifth Circuit certified to the Louisiana Supreme Court the question whether witness immunity bars a claim for negligence against a retained expert witness brought by the party who retained the expert. The Louisiana Supreme Court has heard argument, but not yet issued its opinion in the case which is assigned docket no. 2001 CQ 1106.