In the

# United States Court of Appeals
## For the Seventh Circuit

No. 06-2829

MARGARET MACGREGOR,

*Plaintiff-Appellant*,

*v.*

L. DAVID RUTBERG,

*Defendant-Appellee*.

Appeal from the United States District Court
for the Central District of Illinois.
No. 06-CV-3018—**Jeanne E. Scott**, *Judge*.

ARGUED JANUARY 12, 2007—DECIDED FEBRUARY 27, 2007

Before POSNER, WOOD, and SYKES, *Circuit Judges*.

POSNER, *Circuit Judge*.   The parties to this diversity suit governed by Illinois law are neurosurgeons. Rutberg testified as an expert witness for a patient of MacGregor's in a malpractice suit that the patient had brought against MacGregor in an Illinois state court. In the present case, MacGregor is suing Rutberg, complaining that his testimony in the malpractice suit was defamatory and a breach of contract. The district court dismissed MacGregor's suit for failure to state a claim, and she appeals.

MacGregor had performed an anterior cervical discectomy on the patient who later sued her for mal-

practice. That is an operation in which a herniated disk in the part of the spine that is at the back of the neck is removed through an incision made in the front. In the course of the operation the patient's esophagus was punctured. Her suit alleged that the puncture was due to the negligence of Dr. MacGregor. Dr. Rutberg testified by deposition that MacGregor had indeed failed to exercise due care and that the failure had been responsible for the puncture. He testified that she had placed the surgical retractors—instruments that hold the esophagus, trachea, arteries, and other soft tissue away from the incision to prevent their being damaged by the surgeon's knife—in the wrong position.

The state court granted summary judgment for MacGregor, paving the way for the present suit, in which she alleges—and in the procedural posture of the case we must assume the truth of her allegations—that Rutberg failed to disclose in his deposition that he was offering a medical opinion at variance with the consensus of neurosurgeons and failed even to review the depositions of MacGregor and of the patient, which would have confirmed that MacGregor had put the retractors in the right place. She claims that Rutberg defamed her by his testimony and in addition violated a rule of the professional association to which both of them belonged when he testified—a rule that she argues constituted a contract between Rutberg and her.

Illinois like other states recognizes an absolute privilege for statements in testimony or pleadings in a judicial proceeding. *Ritchey v. Maksin*, 376 N.E.2d 991, 993 (Ill. 1978); *Spaids v. Barrett*, 57 Ill. 289, 291 (1870); *McNall v. Frus*, 784 N.E.2d 238, 239-40 (Ill. App. 2002); *Jurgensen v. Haslinger*, 692 N.E.2d 347, 349-50 (Ill. App. 1998). What a

witness testifies to cannot be made the basis of a suit against him, except a criminal prosecution for perjury or for a crime to which he confessed in the course of testifying. The privilege mainly protects against suits for defamation; however reckless or dishonest the testimony, the witness cannot be sued because of its defamatory content.

A number of states, including Illinois, see, e.g., *Spaids v. Barrett, supra*, 57 Ill. at 291; *Starnes v. Int'l Harvester Co.*, 539 N.E.2d 1372, 1374 (Ill. App. 1989); *McGranahan v. Dahar*, 408 A.2d 121, 129 (N.H. 1979); see also *Briscoe v. LaHue*, 460 U.S. 325, 331 and n. 11 (1983), have carved an exception for cases in which the defamatory testimony is unarguably irrelevant to the case in which it was given—suppose that in the trial of an antitrust case a witness, wanting to take advantage of the privilege, blurted out: "And by the way, my ex-husband is a murderer, a thief, a deadbeat, and a purveyor of child pornography." See *Macie v. Clark Equipment Co.*, 290 N.E.2d 912, 913-15 (Ill. App. 1972); *Parker v. Kirkland*, 18 N.E.2d 709, 712-13 (Ill. App. 1939); *Burdette v. Argile*, 94 Ill. App. 171, 175-77 (1901); *Sherwood v. Powell*, 63 N.W. 1103, 1104 (Minn. 1895). MacGregor wants another exception—an exception for expert testimony.

Now it is true that the privilege is especially designed for the protection and encouragement of disinterested lay witnesses. Since they have no stake in the case and cannot be paid more than a nominal fee for testifying, they would be highly reluctant to testify if the threat of a defamation suit hung over their heads. See *Murphy v. A.A. Matthews*, 841 S.W.2d 671, 674 (Mo. 1992); cf. *McNall v. Frus*, *supra*, 784 N.E.2d at 239. It would be cruel to force them by testifying to assume that risk. Expert witnesses, in contrast,

could be paid to assume the risk. See *Jurgensen v. Haslinger*, *supra*, 692 N.E.2d at 349-50; *Murphy v. A.A. Matthews*, *supra*, 841 S.W.2d at 674. Nevertheless they are not excepted from the privilege, *McNall v. Frus*, *supra*, 784 N.E.2d at 239-40, and that is sensible. Litigation is costly enough without judges' making it more so by throwing open the door to defamation suits against expert witnesses. That would not only tend to turn one case into two or more cases (depending on the number of expert witnesses), but also drive up expert witnesses' fees; expert witnesses would demand as part of their fee for testifying compensation for assuming the risk of being sued because of what they testified to.

The pressure to allow such suits in order to keep expert testimony honest has actually diminished in recent years because of enhanced awareness of the potential abuses involved in such testimony. Courts do much more than they used to do to screen out expert testimony that does not satisfy reasonable standards of scientific accuracy. Fed. R. Evid. 702; *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999); *Wilson v. City of Chicago*, 6 F.3d 1233, 1238-39 (7th Cir. 1993). The screening is imperfect. But it is a better check on the abuses than allowing every unsuccessful lawsuit to be turned into two or more lawsuits as the winner goes after the expert witnesses who testified unsuccessfully against him.

That a privilege is absolute does not define its scope; it merely protects the holder of the privilege from a suit based on deliberate or reckless misconduct ("malice," as the defamation cases say, cf. *Matheny v. United* States, 469 F.3d 1093, 1097 (7th Cir. 2006)), as distinct from a suit based merely on negligence or mistake. E.g., *Zych v. Tucker*, 844 N.E.2d 1004, 1008 (Ill. App. 2006); *Murphy v.*

*A.A. Matthews*, *supra*, 841 S.W.2d at 675. We gave one example of a scope limitation earlier. California has limited its scope further in cases in which a witness spills a trade secret or violates a confidentiality agreement. E.g., *Wentland v. Wass*, 25 Cal. Rptr. 3d 109, 113-16 (App. 2005); *ITT Telecom Products Corp. v. Dooley*, 262 Cal. Rptr. 773, 779-81 (App. 1989). Illinois has not followed suit, however, and perhaps wisely, since there is another, and generally effective, way of protecting trade secrets in litigation—requiring testimony that reveals a trade secret to be given at a hearing from which the public is excluded and the transcript of the testimony sealed.

Noting that the cases affirming the breadth of the privilege in Illinois come from the state's intermediate appellate court rather than from its supreme court, which has not been heard from on the question since *Ritchey v. Maksin*, *supra*, a quarter of a century ago, MacGregor asks us to predict that if seised of the issue the supreme court would carve out an exception either for all expert testimony or for testimony in breach of contract cases. (The plaintiff's contract claim is discussed below; we shall see that it doesn't depend on the scope of the privilege.) But we have explained in previous cases that a person who wants a novel ruling of state law should sue in state court rather than federal court. *Doe v. City of Chicago*, 360 F.3d 667, 672 (7th Cir. 2004); *Haynes v. Alfred A. Knopf, Inc.*, 8 F.3d 1222, 1234 (7th Cir. 1993); *Chang v. Michiana Telecasting Corp.*, 900 F.2d 1085, 1087-88 (7th Cir. 1990); cf. *In re C-T of Virginia, Inc.*, 958 F.2d 606, 611-12 (4th Cir. 1992). Of course if she does that and the defendant removes the case to federal court we must try as best we can to determine whether the state supreme court would adopt the novel ruling. But this is not such a case. The plaintiff

sued in federal court though there was nothing to stop her from suing in an Illinois state court. Had she done that, Rutberg could have removed the case to federal court, but it is not certain that he would have done so.

Moreover, the fact that the Supreme Court of Illinois has not weighed in on the scope of the witness privilege does not mean that that court is likely, should it ever do so, to reject the consensus of the intermediate appellate judges. On the contrary, its reticence suggests, if anything, contentment with that consensus.

At argument, MacGregor's lawyer proposed for the first time that we certify the issue of the scope of the privilege to the Supreme Court of Illinois. The proposal is unfortunate as well as belated, in suggesting rather an excessive taste for litigation on MacGregor's part. For just as her malpractice suit became two suits with the decision to go after the losing party's expert witness, we are invited to split the present suit in two, one piece retained in this court and the other sent to Illinois's supreme court. That might be unavoidable if MacGregor had been dragged into federal court against her will and if the validity of her state-law claim were profoundly unclear, but neither condition is satisfied.

We turn to the breach of contract claim. MacGregor belongs, and Rutberg when he gave his deposition in the malpractice suit belonged, to the American Association of Neurological Surgeons, as nearly 95 percent of board-certified neurosurgeons do. The association's rules include norms for expert testimony by members, among them that "the neurosurgical expert witness shall represent and testify as to the practice behavior of a prudent neurological surgeon giving different viewpoints if such there are" and "shall identify as such any personal opinions that vary

significantly from generally accepted neurological prac-
tice." The validity of these sensible-seeming norms is not
questioned. Dr. Rutberg was expelled from the association
for violating them, and the validity of his expulsion is
not before us. See *Austin v. American Association of Neuro-
logical Surgeons*, 253 F.3d 967 (7th Cir. 2001). The absolute
privilege does not forbid basing disciplinary proceedings,
public or, even more clearly, private, on testimony given
in a judicial proceeding. *Bushell v. Caterpillar, Inc.*, 683
N.E.2d 1286, 1289-90 (Ill. App. 1997).

One can imagine a professional association using ex-
pulsion to resurrect the old "conspiracy of silence"—the
gentlemen's agreement among doctors not to testify against
one another. But there is no suggestion of that. Nor
would such a suggestion strengthen—it would weaken—
MacGregor's case. For if she won, the effect would be to
add suits for defamation and breach of contract to any
other sanctions for violating the association's rules
constraining testimony by expert witnesses.

MacGregor claims that by joining the association,
Rutberg waived the witness's absolute privilege. Like
other privileges, this one can be waived. *Baravati v.
Josephthal, Lyon & Ross, Inc.*, 28 F.3d 704, 707-08 (7th Cir.
1994). And it *was* waived, at least in the limited sense
that by agreeing to abide by rules that regulate members'
testimony, Rutberg disclaimed any right to block, by
claiming that court testimony is sacrosanct, expulsion
from the association for violating its rules; that would have
made his agreeing to abide by those rules empty. Anyway,
as we noted earlier, the absolute privilege is not applicable
in a disciplinary proceeding, as distinct from a lawsuit.

But it would not follow that he had consented to be
sued for breach of contract. Whether he did or not is the

question on which MacGregor's contract claim turns. It is a question of contract interpretation rather than of the scope of the absolute privilege.

Our *Austin* case was a suit for breach of contract, and the contract was the same set of AANS rules on which MacGregor's contract claim is based. But the association was the enforcer, not a member of the association. Now whether the "contract" is enforceable by one member's suing another is not, as the parties think, an issue of third-party beneficiary status—not obviously, in any event (the significance of this qualification will appear shortly). Third-party beneficiaries are nonparties to a contract who are nevertheless allowed to sue to enforce it because the parties intended them to have that right. E.g., *A.J. Maggio Co. v. Willis*, 738 N.E.2d 592, 599 (Ill. App. 2000); *Swaveley v. Freeway Ford Truck Sales, Inc.*, 700 N.E.2d 191, 185 (Ill. App. 1998); *A.E.I. Music Network, Inc. v. Business Computers, Inc.*, 290 F.3d 952, 955 (7th Cir. 2002) (Illinois law). Members of the AANS are bound by its rules. They are not third parties. But the question is whether they are entitled to enforce the rules against each other, or whether just the association's management is authorized to enforce the rules. The question is similar to that of a third party's right to sue to enforce a contract, however, because it is a question about the intentions of the parties concerning who should be able to enforce the contract or selected parts of it.

One could bring this case within the orbit of the doctrine of third-party beneficaries by saying that the rules create a separate contract between each member and the as-sociation, and that the question therefore is whether each member is a third-party beneficiary of the contracts between the other members and the association. So MacGregor would be deemed to be suing to enforce

Rutberg's contractual obligations to the association. That approach would tilt the case even further against MacGregor. For ordinarily a person's entitlement to sue to enforce a contract to which she's not a party must be expressed in the contract rather than implied. *Johnson Bank v. George Korbakes & Co.*, 472 F.3d 439, 441 (7th Cir. 2006) (Illinois law). "Parties to contracts are naturally reluctant to empower a third party to enforce their contract," *id.*, and so courts hesitate to infer such a power. But with or without a presumption against enforcement, MacGregor's claim of breach of contract fails.

This is true even though rules of a private association are sometimes enforceable by members—an example would be a rule that required that disputes between members be arbitrated. *Golden Seed Co. v. Funk Seeds Int'l, Inc.*, 315 N.E.2d 140, 141 (Ill. App. 1974); cf. *Uehara v. Schlade*, 603 N.E.2d 646, 648-50 (Ill. App. 1992). The rule would be for the direct benefit of the disputants and not the rest of the membership, and so they would be the logical enforcers of it. This is not true with regard to the rule governing expert testimony by members. Its logical enforcer is the association's management, cf. *Knolls Condominium Association v. Harms*, 781 N.E.2d 261, 265 (Ill. 2002), and the logical remedy if it determines that there has been a violation is to expel the violator. *Pacaud v. Waite*, 75 N.E. 779, 782 (Ill. 1905); *Pitcher v. Board of Trade*, 13 N.E. 187, 189 (Ill. 1887); *Austin v. American Ass'n of Neurological Surgeons, supra*, 253 F.3d at 968-69 (Illinois law).

The existence of this remedy is another reason why it is unnecessary to allow suits against expert witnesses; Dr. Rutberg's expulsion surely reduced his employability as an expert witness. But there is no indication that in joining the AANS, neurosurgeons think they're exposing themselves to damages suits by other members, or for

that matter by the association, should they ever have the temerity to testify against another member. When you join a club or other association you assume the risk of being expelled for violating its rules, but you hardly expect to be suable, whether by the association or by other members, for infractions of the association's rules in general. You do expect to be suable (in some cases by the association, in some cases by other members) for violating a rule requiring arbitration or for defaulting on financial obligations such as payment of dues and assessments; it is apparent that such rules are intended to create enforceable rights against members. But consenting to be sued for violating *any* of the association's rules would make joining an association a perilous venture indeed, and so would be against the association's interest and therefore is not plausibly regarded as an implied term of the membership agreement.

AFFIRMED.

A true Copy:

    Teste:

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*