IN THE SUPREME COURT OF TENNESSEE
AT NASHVILLE
February 6, 2001 Session

## CHARLOTTE BROWN, ET AL. v. BIRMAN MANAGED CARE, INC., ET AL.

### Appeal by permission from the Court of Appeals, Middle Section
### Circuit Court for Putnam County
### No. 97-J0266    John A. Turnbull, Judge

---

### No. M1999-02551-SC-R11-CV - Filed April 25, 2001

---

The plaintiff, individually and on behalf of her daughter, sued her former husband and his employers for fraud and civil conspiracy to defraud. She alleges that these defendants successfully carried out a plan to reduce the amount of her former husband's child support payments. Part of the plaintiff's conspiracy claim is based on the testimony of her former husband in a child support hearing in which he is alleged to have falsely stated his income. The defendants moved for summary judgment on two grounds: (1) the quality of the plaintiff's evidence and (2) the defense of "testimonial privilege," which grants a witness immunity from subsequent civil liability based on testimony he gave in a judicial proceeding. The trial court granted the defendants' motion. The Court of Appeals, in an opinion authored by Judge Cantrell, reversed, holding that the defendants were not entitled to summary judgment and that the former husband's testimony comes within the "larger conspiracy" exception to the testimonial privilege. We affirm both holdings of the Court of Appeals.

### Tenn. R. App. P. 11 Application for Permission to Appeal; Judgment of the Court of Appeals Affirmed

FRANK F. DROWOTA, III, J., delivered the opinion of the court, in which ,E. RILEY ANDERSON, C.J., ADOLPHO A. BIRCH, JR., JANICE M. HOLDER, and, WILLIAM M. BARKER, JJ. joined.

Kelli L. Thompson, Knoxville, Tennessee, for the appellants, Birman Managed Care, Inc., Birman & Associates, Inc., Dr. David N. Birman, and Sue D. Birman.

Steve D. Gibson, Ashland City, Tennessee, for the appellee, Charlotte Brown, individually and as custodial parent on behalf of the minor child Christen Barenkamp.

**OPINION**

Charlotte Brown ("Brown") and William F. Barenkamp, II ("Barenkamp") were married in 1980 and lived in Connecticut. The next year they had a child, Christen Barenkamp, and a few years later were divorced. In 1988, a Connecticut court awarded Brown custody of Christen and ordered Barenkamp to pay child support in the amount of $25 per week.

Barenkamp later moved to Cookeville, Tennessee, where he met his second wife, Kathy. In Tennessee, the Barenkamps became close friends with Dr. David N. Birman ("Dr. Birman"), the founder and principal of Birman Managed Care, Inc., ("BMCI"), and its subsidiary, Birman & Associates ("B&A"), and with his wife, Sue, who was a senior company executive. In 1990, the Barenkamps moved to Texas. Three years later, a court in Dallas, Texas modified the Connecticut child support order by increasing Barenkamp's payments to $335 per month.

In November 1993, the Barenkamps moved back to Tennessee. Barenkamp began working as the Director of Marketing for B&A at an annual salary of $25,000. Kathy Barenkamp was hired by B&A at a salary of $15,000. She was given the title of secretary, though, as we discuss below, her role as an employee is in dispute. Barenkamp rose rapidly through the executive ranks. He became the Chief Operating Officer (COO) of the company before the end of 1996, eventually earning a salary of $100,000. Kathy's salary reached over $40,000 before she resigned in November 1995.

In late 1995, Brown petitioned the Circuit Court of Putnam County, Tennessee to modify the Texas order to reflect Barenkamp's increased income. During the petition hearing, on April 19, 1996, Barenkamp testified that his income was $5,400 per month ($65,000 per year). He failed to mention his bonus income of $20,000 per year, although the 1995 W-2 form he submitted to the court appears to include this income. Based on Barenkamp's testimony, the court increased his child support payment from $335 per month to $787.50 per month, and directed B&A to withhold this amount from Barenkamp's paycheck. This order became final on June 28, 1996. On July 1, 1996, the next business day, B&A gave Barenkamp a $25,000 raise. Brown claims that Barenkamp's testimony and the timing of his raise are part of a "Bonus Scheme," in which Barenkamp and his employers concealed part of his income to reduce his child support payments.

Brown also claims that Barenkamp and his employers participated in a "Secretary Scheme" to accomplish the same goal. She has gathered a large amount of evidence which she claims supports this allegation. In particular, the record shows that Brown was first informed by two anonymous letters that B&A was splitting Barenkamp's salary with his wife in order to minimize his child support obligation. The letter was purportedly written by a former employee of B&A who claimed to be outraged by such conduct. Brown also points to affidavits and depositions of former B&A employees which, she argues, confirm the allegations contained in the letter. The Barenkamps sought to rebut this evidence before the Court of Appeals by characterizing it as rumor and conjecture from disgruntled, former employees. Brown also points to Sue Birman's deposition and

other evidence regarding Kathy Barenkamp's salary in support of her allegations. We discuss this and other evidence more fully below.

Based on this evidence, Brown brought a claim in the trial court for fraud and civil conspiracy to commit fraud against the following defendants: the Barenkamps, the Birmans, BMCI, and B&A. She alleges that they all conspired to reduce Barenkamp's child support payments (through the Bonus and Secretary Schemes), ultimately avoiding $89,375 in payments to which her daughter was entitled. The defendants filed a motion to dismiss which, through the submission of affidavits and other evidence, was converted to a motion for summary judgment. The court granted this motion. Brown appealed to the Court of Appeals, which reversed the trial court, holding that she had presented sufficient evidence to establish genuine issues for trial on her fraud and conspiracy claims.

The Court of Appeals also considered the defendants' argument that Brown's claims must be dismissed because they are based on Barenkamp's testimony before the circuit court in the child support hearing. The court held that although under Tennessee law witnesses testifying before a court are granted immunity from future civil liability relating to that testimony – what is often called the "testimonial privilege" – an exception to this rule applies here. This exception, explained further below, is known as the "larger conspiracy" exception to the testimonial privilege, and it applies where testimony at trial is simply one stage in a multi-staged plan – the rest of the stages occurring outside of court – to cause the plaintiff harm. Where this exception applies, the court reasoned, the defendant loses the immunity normally attached to trial testimony. The court held that Barenkamp's statement of his income in the child support hearing falls into this exception, and therefore Brown may base her claims on this allegedly false testimony.

We take up both issues discussed by the Court of Appeals. First, we decide whether the intermediate court erred in reversing the trial court's grant of summary judgment. Second, we decide whether the court erred in holding that Brown may sue the defendants based on Barenkamp's trial testimony, because that testimony was part of the larger conspiracy exception. We note that only the Birman defendants – Dr. and Mrs. Birman, BMCI, and B&A – have appealed to this Court. We shall refer to them, where appropriate, as the appellants; we shall use the term defendants to refer to the appellants in combination with the Barenkamps.

ANALYSIS

Both issues on appeal are questions of law, which we review de novo, without a presumption of correctness of the Court of Appeals' judgment. See Nelson v. Wal-Mart Stores, Inc., 8 S.W.3d 625, 628 (Tenn. 1999).

Summary Judgment

Tennessee Rule of Civil Procedure 56.04 provides that summary judgment is appropriate where: (1) there is no genuine issue with regard to the material facts relevant to the claim or defense contained in the motion, and (2) the moving party is entitled to judgment as a matter of law on the

undisputed facts.  See Staples v. CBL & Associates, Inc., 15 S.W.3d 83, 88 (Tenn. 2000); Bain v. Wells, 936 S.W.2d 618, 622 (Tenn. 1997); Byrd v. Hall, 847 S.W.2d 208 (Tenn. 1993).  "Courts must view the evidence in the light most favorable to the nonmoving party and must also draw all reasonable inferences in the nonmoving party's favor."  Staples, 15 S.W.3d at 89.  "Courts should grant a summary judgment only when both the facts and the inferences to be drawn from the facts permit a reasonable person to reach only one conclusion."  Id.

Brown's suit charges the defendants with having committed two common law torts, fraud and conspiracy to defraud.  The common law action for fraud may be stated as follows:

> When a party intentionally misrepresents a material fact or produces a false impression in order to mislead another or to obtain an undue advantage over him, there is a positive fraud.  The representation must have been made with knowledge of its falsity and with a fraudulent intent.  The representation must have been to an existing fact which is material and the plaintiff must have reasonably relied upon that misrepresentation to his injury.

First Nat'l Bank v. Brooks Farms, 821 S.W.2d 925, 927 (Tenn. 1991) (quoting Haynes v. Cumberland Builders, Inc., 546 S.W.2d 228, 232 (Tenn. Ct. App. 1976)); see also Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 (Tenn. 1992); Dobbs v. Guenther, 846 S.W.2d 270, 274 (Tenn. Ct. App. 1993).  "Tennessee courts have recognized that fraud by its nature is often difficult to prove and thus may be properly proved by wholly circumstantial evidence."  Edwards v. Travelers Ins. of Hartford, 563 F.2d 105, 112 (6th Cir. 1977) (citing Parrott v. Parrott, 48 Tenn. 681, 687 (1870)).

Brown's claim is that the defendants committed fraud by intentionally reducing Barenkamp's income through two separate schemes – the Secretary Scheme and the Bonus Scheme – so that he could avoid paying the full amount of child support to which Christen was legally entitled.  The alleged false representation was Barenkamp's testimony before the circuit court about his income.  Brown argues that she relied on this misrepresentation, in the sense that the court set Barenkamp's child support payments based on his testimony, and that her daughter has suffered financially as a result.  The appellants' response is twofold:  first, they deny these factual allegations and, second, they assert that even if they are true Brown's suit must fail because, unlike Barenkamp, they had no duty to report his income to the circuit court, see Dobbs, 846 S.W.2d at 274 ("Nondisclosure will give rise to a claim for fraud when the defendant has a duty to disclose . . .").[1]

We have very recently discussed the common law action of conspiracy to defraud.  See Chenault v. Walker, ___ S.W.3d ___ (Tenn. 2001) (upholding the validity of the conspiracy theory of personal jurisdiction).  This tort is defined as a "combination between two or more persons to accomplish by concert an unlawful purpose, or to accomplish a purpose not in itself unlawful by unlawful means."  Id. (quoting Dale v. Thomas H. Temple Co., 186 Tenn. 69, 90, 208 S.W.2d 344,

---

[1] As noted above, the appellants also assert the defense of testimonial privilege, based on Barenkamp's testimony.  They claim that this privilege presents a bar to all of Brown's claims, regardless of the truth of her factual allegations.  We discuss this argument at length later in this opinion.

353 (1948)); see also Huckeby v. Spangler, 521 S.W.2d 568, 573 (Tenn. 1975); Braswell v. Carothers, 863 S.W.2d 722, 727 (Tenn. Ct. App. 1993); Kirksey v. Overton Pub, Inc., 739 S.W.2d 230, 236 (Tenn. Ct. App. 1987). Each conspirator must have the intent to accomplish this common purpose, and each must know of the other's intent. Dale, 186 Tenn. at 90, 208 S.W.2d at 353-54. The agreement "need not be formal, the understanding may be a tacit one, and it is not essential that each conspirator have knowledge of the details of the conspiracy." Id. Finally, "it is [a] basic principle that each conspirator is responsible for everything done by his confederate which the execution of the common design makes probable as a consequence"; in other words, each conspirator is liable for the damage caused by the other. Id. 186 Tenn. at 90-91, 208 S.W.2d at 354; accord Huckeby, 521 S.W.2d at 573-74.

Brown's conspiracy to defraud claim charges the defendants with conspiring to commit the alleged child support fraud described above. The appellants' response is similar to their argument concerning the fraud claim: they deny all allegations of wrongdoing. Therefore, they have not joined with Barenkamp to accomplish an "unlawful purpose, or to accomplish a purpose not in itself unlawful by unlawful means." Dale, 186 Tenn. at 90, 208 S.W.2d at 353.

Our review of the record leads us to conclude that, in the language of Tenn. R. Civ. P. 56.04, genuine issues of material fact exist such that the defendants are not entitled to judgment as a matter of law.

Brown has adduced evidence which she claims shows that Barenkamp and the appellants conspired to reduce his child support payments, and that this conspiracy was successful, i.e., they in fact carried out the fraud they set out to accomplish. We find, as the Court of Appeals noted, that Brown has produced a "wealth of evidence" gathered in discovery. In the interest of brevity, we need only discuss the affidavits of former B&A employees, the deposition of Sue Birman, evidence regarding Kathy Barenkamp's salary (and inferences to be drawn from that evidence); Barenkamp's testimony in the child support hearing; and evidence regarding B&A's payment of Barenkamp's income. This evidence alone is significant enough to warrant the denial of the defendants' motion.

Brown first learned of the Secretary Scheme when she received two anonymous letters claiming that part of Barenkamp's income was being diverted to his wife to reduce his child support payments. The letters were purportedly written by a former employee of B&A, who claims that Kathy Barenkamp was never a true employee of the company. Brown's lawyers pursued this theme and were successful in finding various former B&A employees to substantiate the charges in the letters.

Once such employee is Theresa Havener. Ms. Havener was an Administrative Assistant for B&A from 1991 to 1995. She claims to have had daily contact with Barenkamp and Sue Birman. One day, she affirms, Sue Birman came to her workstation and expressed concern about the large amount of child support Barenkamp would owe based on his employment at B&A. Moreover, Kathy Barenkamp was expecting a baby, which would further strain the Barenkamps' finances. Since the

Birmans wanted to help Barenkamp out, Ms. Havener claims, they had decided to put Kathy on the payroll as a secretary. Ms. Havener states in her affidavit:

> I understood Sue Birman to be indicating to me that Kathy Barenkamp, who was well along in her pregnancy by that time, would not be doing any actual work as a "secretary" – but rather that this was simply the title under which she would be paid, so that Bill Barenkamp would not have to pay child support on the money his family received in that way.
>
> During my employment with [B&A], I never knew Kathy Barenkamp to personally hold herself out as a "secretary," or to perform any actual work as a secretary. . . . It was a matter of general knowledge among the employees of [B&A] that Kathy Barenkamp did not actually work outside the home and that she was being paid part of her husband's salary in order to reduce his child support obligation.

Another former employee, Linda Holloway, reinforces Ms. Havener's allegations. Ms. Holloway was a secretary for B&A from 1992 to 1995. She sent paychecks to Kathy Barenkamp on a regular basis. Ms. Holloway states in her affidavit:

> During my employment with the Birman company I was never made aware of Kathy Barenkamp's job title. . . . I never knew Kathy Barenkamp to hold herself out as or to perform any actual work as a "secretary." . . . I never knew [Kathy] to hold herself out as or to perform any actual work as an "assistant" to Sue Birman. The only times I ever saw [Kathy] at the 502 Gould Drive office building was when she dropped by to visit (with her newborn infant in her arms). . . . I never knew Sue Birman to hold out Kathy Barenkamp as her "assistant" in any relationship or capacity.

Another employee, Dallas Riley, makes the same allegations. Mr. Riley succeeded Barenkamp as the Director of Marketing for B&A. He testified in his deposition that "it was common knowledge within the firm, [that] part of Mr. Barenkamp's income was being diverted to Kathy Barenkamp in order for him to avoid paying child support to the child of his and Charlotte Brown." Mr. Riley further testified that this statement is based on his conversations with several B&A employees, including Linda Holloway, as well as several company executives.

Also worth mentioning is the affidavit of Paula Yost, who was Associate Director of Finance for B&A between August 1994 and August 1995. Like Ms. Havener, Ms. Yost affirms that Sue Birman discussed with her the possibility of allocating a portion of Barenkamp's income to Kathy Barenkamp. According to Ms. Yost, Sue stated that the reason for this allocation was "the situation with Bill's ex-wife."

Sue Birman testified in her deposition about these matters. First, she denies that she spoke to any company employee about Barenkamp's child support obligations. Second, she discusses Kathy Barenkamp's employment. She states that while Kathy was a "traditional secretary" for a time, she eventually became responsible for teaching and taking care of the Birmans' children. When asked if she ever performed secretarial work other than answering the phone, Sue responded,

"I can't remember. I don't think so, other than answering the telephones. There may have been a couple of letters, if she had time to do them, but very early on the demands of the children were such that . . ." Kathy Barenkamp's deposition testimony is consistent with Sue Birman's testimony, for she claims that her principal responsibility was to care for the children.

Apart from the affidavits and depositions, Brown also relies on allegedly forged documents she claims were used to cover up the Secretary Scheme fraud. The first document is Kathy Barenkamp's "Employment Agreement" with B&A, dated November 9, 1993. The second is Kathy Barenkamp's resignation letter to Sue Birman, dated November 14, 1995. Both documents are signed, "Kathy Barenkamp," and the first is also notarized. Brown alleges that these documents were actually signed by Ryan Masters, an accountant for B&A and Sue Birman's assistant, who forged Kathy's name. Brown's attorney hired Jane Eakes, a certified forensic examiner, to examine the signatures. Ms. Eakes's opinion is that Ryan Masters signed Kathy's name on both documents. If true, Brown argues, this evidence lends further support to the charge that Kathy Barenkamp was not a legitimate company employee.

In one sense, perhaps, all this evidence does not raise a factual dispute: all agree that Kathy Barenkamp was not really a "secretary," as that term is commonly used, but was paid primarily to care for the Birmans' children. The appellants argue that Kathy's employment as a caregiver was entirely proper, and that other employees of Birman Farms, Inc., a B&A subsidiary corporation, helped the Birmans with household duties. Coupled with Ms. Havener's and Ms. Yost's recollections of their conversation with Sue Birman, however, a jury could reasonably infer that Kathy Barenkamp was not a legitimate employee of the company, and that she was paid to help ease the burden of Barenkamp's child support payments.

In addition to these affidavits and depositions, Brown makes much of Kathy Barenkamp's salary, as compared to her husband's. Brown points to a document from Fannie Mae, entitled "Request for Verification of Employment," which shows that Kathy's gross salary was increased from $860.74 to $1666.67 per pay period (every other week), beginning in March 1995, resulting in an annual salary of over $40,000. Brown also points to a B&A check made out to Kathy, which indicates that she was also receiving four bonuses of $5,000 each. In April 1995, the Birmans promoted Barenkamp to Vice President and COO of B&A. Although the evidence is not entirely clear, it appears that until June 30, 1995 Barenkamp's base salary was $25,000; after that date he received a raise of $15,000 per year. (This income does not include a series of bonuses he received, which, like Kathy Barenkamp, increased his 1995 income by $20,000; this will be discussed below.) In the appellant's favor, the evidence shows that Barenkamp's salary soon increased from the $25,000-$40,000 per year range; his 1996 W-2 form shows wages of $89,408.01. But it appears from the documents that for several months Barenkamp, a senior executive, was making less than his wife, whose primary responsibility was taking care of the Birmans' children. The most reasonable inference, Brown argues, is that part of Barenkamp's salary was diverted to his wife, for the purpose of reducing his child support payments. This inference is made stronger, she argues, by the fact that Barenkamp's predecessor as COO earned $100,000 per year. While Barenkamp

eventually earned that much, his salary upon promotion to that office was substantially less, notwithstanding the fact that he – unlike the previous COO – was also promoted to Vice President.

In rebuttal, the appellants emphasize that Barenkamp's salary grew with his responsibilities, just as one would expect. They also assert that Kathy's salary was high, in part, because towards the end of her employment she also cared for Sue Birman, who had been diagnosed with an illness. The appellants may be correct that their salary arrangements with the Barenkamps were aboveboard, and that Brown's presentation of these arrangements is misleading, but Brown may reasonably argue to the contrary, and, if her presentation is correct, this salary evidence helps substantiate her allegations.

We have already outlined Brown's Bonus Scheme allegations: she claims that the defendants sought to avoid Barenkamp's full child support obligation by hiding a portion of his income through bonuses. The evidence supporting this allegation is not as strong or transparent as the Secretary Scheme evidence. The charge is that Barenkamp, when testifying before the trial court in the 1996 child support hearing, only reported his salary income, which by the end of 1995 had reached $65,000 per year. But Barenkamp had also been receiving regular bonuses, the largest being a lump sum of $5,000. These bonuses, by the end of 1995, totaled $20,000. Barenkamp stated in his deposition that he did not mention these bonuses because he did not think he was obligated to report performance-based income. The appellants also contend that, despite his testimony, Barenkamp's W-2 form, which was submitted to the court, included his 1995 bonus income.

It is conceivable that a reasonable jury could doubt Barenkamp's explanation for omitting $20,000 worth of income in his testimony, and infer that his intent was to commit fraud. Yet this evidence is not intrinsically strong, and were this Brown's only support for her claim, the defendants would have a much stronger argument in favor of their summary judgment motion. Of course, this is not the only evidence, and a jury could reasonably conclude that Barenkamp's testimony – not worth much alone – takes on more significance in light of Brown's entire case. Regardless of whether Barenkamp's testimony can fairly be viewed as implicating him in a fraudulent act, however, it is difficult to see how it implicates the appellants, as they forcefully argue. Brown's attorneys argue that the appellants "conspired to pay Bill Barenkamp in this particular manner, knowing and intending that he would feel no obligation to divulge such renumeration to the courts." However, they do not support this allegation with specific facts in the record.

Apart from Barenkamp's testimony, Brown has other evidence to back up her Bonus Scheme allegation (although this evidence suggests that the phrase "Salary Scheme" allegation would be more apt). Brown points to a document, which is signed by a senior B&A accountant, indicating that Barenkamp was scheduled to receive a salary increase in early January of 1996. According to Brown, Barenkamp did not receive this raise, which was for $25,000, until July 1, 1996. This, she argues, is suspicious. She quotes a statement from one of the appellants' briefs: "[The child support] Order was made April 19, 1996 and entered May 28, 1996. Plaintiff had 30 days in which to appeal the Order. She did not do so." This statement is correct, meaning that the order became final on Friday, June 28, 1996. Thus, she argues, the appellants postponed Barenkamp's scheduled

raise for several months until the very next business day after the child support order became final, at which time he received an extra $25,000 per year. Coupled with the other evidence she has gathered, Brown is correct that a jury might reasonably find this circumstantial evidence persuasive.

In response to Brown's evidence, we have seen that the appellants offer counter-explanations and counter-inferences they believe must be drawn in their favor. We have also seen that their arguments are insufficient on the merits to warrant summary judgment. The appellants, however, raise another argument throughout their briefs which they assert compels the granting of their motion – even if Barenkamp has committed fraud and even if they have helped him do so. Simply put, at no time up to and including the child support hearing did they ever owe any "duty to report" Barenkamp's income, either to Brown or the court in the child support hearing. Without a duty to report, as a matter of law they have made no misrepresentations on which a fraud claim can be based. See Dobbs, 846 S.W.2d at 274 ("Nondisclosure will give rise to a claim for fraud when the defendant has a duty to disclose . . ."). In other words, even if all of Brown's Secretary Scheme and Bonus Scheme allegations are correct, it does not matter; there is no fraud unless the victim relies to her detriment on a fraudulent representation made by the wrongdoer; since only Barenkamp made the fraudulent representation on which she relied – the statement of his actual income, which failed to include income diverted to his wife and certain bonus and salary income – only he can be held liable.

This argument ignores the basic principle of conspiracy law, that one conspirator is liable for the acts of his co-conspirator done in furtherance of the conspiracy. See Dale, 186 Tenn. at 90-91, 208 S.W.2d at 354; Huckeby, 521 S.W.2d at 573-74. If the appellants were actively involved in hiding Barenkamp's income to help him avoid child support payments, they cannot distance themselves from his testimony made in furtherance of their common purpose. One cannot conspire with another to commit fraud, actually take steps to accomplish the unlawful plan, and then avoid liability by denying having made the fraudulent representation necessary to complete it.

### Testimonial Privilege

Even if Brown has presented evidence sufficient to withstand summary judgment, the appellants assert that this case should still be dismissed. They argue that because of the testimonial privilege, Barenkamp is immune from all tort liability based on his testimony in the child support hearing; without his testimony Brown's fraud claim against him collapses, since there is no longer a fraudulent representation on which her claim can be based; and without the fraud claim against Barenkamp there is no basis for a conspiracy claim against them. We agree with the Court of Appeals that this argument is not correct.

Tennessee law recognizes the testimonial privilege, which gives a witness who testifies in a judicial proceeding immunity from damages sought in a later civil suit based on his allegedly false testimony. See Logan's Supermarkets, Inc., v. McCalla, 208 Tenn. 68, 72-74, 343 S.W.2d 892, 894 (1961); Felts v. Paradise, 178 Tenn. 421, 423-24, 158 S.W.2d 727, 728 (1942); Cooley v. Gaylon, 109 Tenn. 1, 8-16, 70 S.W. 607, 609-10 (1902); Farley v. Clayton, 928 S.W.2d 931, 935 (Tenn. Ct. App. 1996); Buckler v. Carlton, 623 S.W.2d 102, 108 (Tenn. Ct. App. 1981). Many other states also

recognize the testimonial privilege, see, e.g., Murphy v. A. A. Mathews, 841 S.W.2d 671, 674 (Mo. 1992); Bruce v. Byrne-Stevens & Assocs. Eng'rs, Inc., 776 P.2d 666, 667 (Wash. 1989); Radue v. Dill, 246 N.W.2d 507, 509 (Wis. 1976), as do the federal courts, see Briscoe v. LaHue, 460 U.S. 325, 332-33, 103 S. Ct. 1108, 1114, 75 L. Ed. 2d. 96 (1983); Spurlock v. Satterfield, 167 F.3d 995, 1001 (6th Cir. 1999) ("It is well-settled that witnesses are granted absolute immunity from suit for all testimony provided in judicial proceedings."); Quirk v. Mustang Eng'g, Inc., 143 F.3d 973, 975 (5th Cir. 1998).

There are several reasons supporting this common law privilege. In general, "the claims of the individual must yield to the dictates of public policy, which requires that the paths which lead to the ascertainment of truth should be left as free and unobstructed as possible." Briscoe, 460 U.S. at 332-33, 103 S. Ct. at 1114 (quoting Calkins v. Sumner, 13 Wis. 193, 197 (1860)). More specifically, absent immunity from future liability, "witnesses might be reluctant to come forward to testify," but even when they do their "testimony might be distorted by fear of subsequent liability." Id. 460 U.S. at 333, 103 S. Ct. at 1114 (citations omitted) (noting that, absent immunity, a witness might be "inclined to shade his testimony in favor of the potential plaintiff, to magnify uncertainties, and thus to deprive the finder of fact of candid, objective, and undistorted evidence"). Our judicial system seeks to avoid this fate, recognizing instead that the "truth-finding process is better served if the witness's testimony is submitted to 'crucible of the judicial process so that the factfinder may consider it, after cross-examination, together with the other evidence in the case to determine where the truth lies.'" Id. 460 U.S. at 333-34, 103 S. Ct. at 1115 (quoting Imbler v. Pachtman, 424 U.S. 409, 440, 96 S. Ct. 984, 999, 47 L. Ed. 2d 128 (1976) (White, J., concurring in the judgment)).

Although its rationale is well-grounded, the testimonial privilege, like all immunities, comes at a cost. Indeed, any privilege of general application protects those who deserve it, as well as those who do not. See Murphy, 841 S.W.2d at 674 ("The underlying premise of all immunities is that 'though the defendant might be a wrongdoer, social values of great importance require[d] that the defendant escape liability.'" (quoting Prosser and Keeton on Torts 1032 (5th ed. 1984)). This fact explains why, despite a general acceptance of the common law privilege, there is debate in the case law over its proper contours. For instance, some would restrict the privilege to its early roots in the context of defamation law, while others advocate a more expansive application. Compare Murphy, 841 S.W.2d 671 (arguing that the testimonial privilege should be restricted to defamation, defamation-type, and retaliatory cases against adverse witnesses) with Byrne-Stevens, 776 P.2d 666 (rejecting this view and holding that the privilege extends to negligence suits against expert witnesses). In this case, however, we need not venture into this debate, or any other debate concerning the broad contours of the privilege. Rather, the appellants' argument only requires us to evaluate the validity of one narrow exception to the privilege, namely, the "larger conspiracy" exception.

The larger conspiracy exception holds that a witness who gives false testimony that is a "means to, or a step in, the accomplishment of some larger actionable conspiracy" may not claim the privilege; his perjury can provide the basis for a subsequent civil action. Buckler, 623 S.W.2d at 108 (citing Robinson v. Missouri Pacific Transp. Co., 85 F. Supp. 235 (W.D. Ark. 1949)). This doctrine

-10-

does *not* apply to a witness who merely conspires to give perjured testimony. Since committing perjury itself does not destroy the privilege, a rule that conspiring to commit perjury will destroy it makes little sense, or, as we have previously stated, "it cannot be that a conspiracy to do a thing is actionable when the thing itself would not be." Felts, 178 Tenn. at 434, 158 S.W.2d at 729 (citation omitted). In contrast, the larger conspiracy exception applies where the conspiracy is to commit some wrong other than perjury, and the conspirators use the judicial system to help accomplish their plan. A clear example is given by the Alabama Supreme Court:

> Suppose, for example, that two or more persons deliberately and consciously agreed with each other to fraudulently deprive a named beneficiary of the proceeds of a testator's estate. To succeed in this effort, it is necessary to invalidate the will of the testator. Once admitted to probate, the only way a will may be invalidated is through a judicial proceeding. If the contestants are successful in their efforts to defeat the will by falsely testifying that the testator lacked testamentary capacity, for example, they should not be permitted to claim judicial privilege. Their perjury was but a step in the scheme to deprive the beneficiary of the proceeds of the estate.

Snyder v. Faget, 326 So.2d 113, 118 (Ala. 1976).

As this example illustrates, the larger conspiracy exception is thoroughly reasonable and we now explicitly recognize it. One can even question whether it is an "exception" to the testimonial privilege, for it seems implicit in the definition of the privilege. Where the larger conspiracy doctrine applies, a civil conspiracy suit against a defendant who gave false testimony in an earlier proceeding is not "based" on that false testimony; rather, the suit is based on the conspiracy. It is not the perjury itself that is complained of, but the underlying wrong that the perjury helped bring about. Nevertheless, in this case, as the appellants point out, Brown's claims for fraud and conspiracy to defraud cannot survive unless she can use Barenkamp's testimony in the child support hearing. Absent that testimony, the defendants have made no representations on which Brown relied to her detriment, for it was only Barenkamp's allegedly false representations of his income that caused the court to set child support payments below the allegedly proper level. In other words, assuming Brown's allegations are correct, Barenkamp's testimony was necessary to complete the fraud. Since Brown's complaint would have to be dismissed if she could not use Barenkamp's testimony, the defendants correctly argue that the outcome of this case turns on the validity of the larger conspiracy doctrine.

Having held that the larger conspiracy doctrine is valid, we must determine whether it applies here. We hold that it does and, therefore, that the Court of Appeals correctly held that the testimonial privilege does not entitle the defendants to summary judgment. Our decision is supported by the well-reasoned case of Frist v. Gallant, 240 F. Supp. 827 (W.D.S.C. 1965). In Frist, the plaintiff filed an action for divorce and alimony against her husband on the ground of desertion. In that proceeding, she alleged, the husband claimed his income was $125.00 per week when it was actually over $20,000 per year. The court based its alimony award on the husband's testimony. The plaintiff then filed a separate action in federal district court for fraud and deceit, alleging that her husband and his father conspired together to reduce his alimony payments. The defendants, citing

the testimonial privilege, moved to dismiss her complaint. The district court denied their motion: "if, under the alleged circumstances of this case, plaintiff is able to establish all the necessary elements of fraud and deceit, the court feels strongly that she should have her day in court to seek redress for such alleged wrongful conduct, as her cause of action is based on more than the mere giving of perjured testimony." Frist, 240 F. Supp. at 828.

The holding of Frist is compelling. Just as the plaintiff in that case could seek redress against her former husband and his father for allegedly conspiring to reduce her alimony, Brown may seek redress against the Barenkamps and the appellants for allegedly conspiring to reduce Christen's child support payments. As the court in Frist recognized, the testimonial privilege cannot bar a plaintiff's action for fraud and conspiracy to defraud because such an action does not seek redress for the defendant's false testimony, as would be true in a conspiracy to commit perjury case. The action, rather, is based on a conspiracy to commit some other wrong, which is partly accomplished by out-of-court conduct and ultimately completed by use of the courts. As another court has put it, "[t]he simple fact that acts may ultimately lead to witness testimony does not serve to cloak these actions with absolute testimonial immunity." Spurlock, 167 F.3d at 1001 (citations omitted).

We have already analyzed Brown's evidence and found it sufficient to defeat the defendants' motion for summary judgment. That analysis applies with equal force here, requiring the conclusion that Brown may invoke the larger conspiracy doctrine to counter the appellants' testimonial privilege defense. The appellants dispute this evidence and offer counter-explanations and contrary inferences which, if believed, would allow a jury to find that the defendants did not engage in a conspiracy. But that is a matter for trial.

## CONCLUSION

For the reasons discussed above, we affirm the decision of the Court of Appeals holding that the defendants are not entitled to summary judgment on Brown's fraud and conspiracy to defraud claims. This conclusion is not altered by the appellants' invocation of the testimonial privilege because Brown's claims fit within the "larger conspiracy" exception to that privilege.

_____
FRANK F. DROWOTA, III, JUSTICE

-12-