IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
February 14, 2002 Session

## JAMES RANDALL SLAUGHTER, ET AL. v. DUCK RIVER ELECTRIC MEMBERSHIP CORPORATION, ET AL.

**Appeal from the Circuit Court for Maury County**
**No. 8210     Robert L. Holloway, Jr., Judge**

---

**No. M2000-00453-COA-R3-CV - Filed May 7, 2002**

---

This is an appeal from an order of the trial court granting a motion for summary judgment in favor of the defendant, Duck River Electric Membership Corporation and the third-party defendant, Osborne Electrical Contractors, Inc., on the ground that Duck River Electric Membership Corporation was a statutory employer for the purposes of the Tennessee Workers' Compensation Act at the time the plaintiff, James Randall Slaughter, received a severe electrical shock resulting in massive injuries. For the reasons herein stated, we affirm the judgment of the trial court and remand.

**Tenn. R. App. P. 3 Appeal as a Right; Judgment of the Trial Court**
**Affirmed and Remanded**

VERNON NEAL, Sp. J., delivered the opinion of the court, in which BEN H. CANTRELL, P.J., M.S. and PATRICIA J. COTTRELL, J., joined.

Walter W. Bussart, Lewisburg, Tennessee, for the appellants, James Randall Slaughter and Beverly Slaughter.

Thomas M. Donnell, Jr., and Jeffrey M. Beemer, Nashville, Tennessee, for the appellee, Duck River Electric Membership Corporation.

George Andrew Rowlett, Nashville, Tennessee, for the appellee, Osborne Electrical Contractors, Inc.

## OPINION

Duck River Electric Membership Corporation (hereafter DREMC) is an electric cooperative engaged in the sale and distribution of electric power. James Randall Slaughter was an employee of Osborne Electrical Contractors, Inc., (hereafter Osborne) which had a contract with DREMC for reconduction work on electrical distribution lines in Maury County.

Mr. Slaughter was working on a line owned and maintained by DREMC on February 13, 1995. He was alone in the bucket of a boom truck attaching a guide wire to a pole near a transformer and high voltage line when the bucket lurched, causing his body to come into contact with a high voltage line which was transmitting 13,400 volts of electricity resulting in serious injuries. The severe electrical shock rendered him unconscious with no pulse. Fellow workers were able to bring him to the ground where they resuscitated him and had him life flighted to Vanderbilt Medical Center for his burn injuries. He survived but lost both arms past the shoulder joint and is totally and permanently disabled. He was paid workers' compensation benefits by his employer, Osborne.

Plaintiffs filed a negligence case in the Circuit Court against various defendants including DREMC. Defendant DREMC filed a motion for summary judgment on the ground that it was a statutory employer of plaintiff James Randall Slaughter at the time of his accident on February 13, 1995, and, thus, was immune to a tort action pursuant to the Tennessee Workers' Compensation Act. In the alternative, DREMC took the position that it did not owe a duty of care to the plaintiff for which it could be held liable. The trial court, by order entered by Judge Hamilton, denied the motion for summary judgment finding that there were genuine issues of material facts for trial by jury. DREMC moved for an interlocutory appeal and that motion was denied.

Subsequent to denial of its motions for summary judgment and interlocutory appeal, DREMC filed a motion pursuant to Rule 14.01 of the Tenn. R. Civ. P. for an order allowing it to file a third-party complaint against Osborne to seek enforcement of a hold harmless and indemnity provision in DREMC's distribution line extension construction contract with Osborne. Although plaintiffs initially opposed that motion, the order entered by the trial court allowing the motion states that the parties were in agreement that the motion should be granted as evidenced by the signature of counsel on the order as entered. The parties agreed that the trial of the third-party complaint would be severed from the trial of the original action with the further provision that the discovery in the original action and third-party action was to be conducted jointly.

Osborne filed an answer to the third-party complaint and afterward filed a motion for summary judgment on the grounds that 1) the hold harmless provision of the contract between it and DREMC was void and unenforceable and 2) DREMC was a statutory employer of the plaintiff and was, thus, immune from liability under the Tennessee Workers' Compensation Act. DREMC responded to Osborne's motion for summary judgment in which it moved the court to reconsider its motion for summary judgment which had been previously denied. On February 8, 2000, Judge Holloway entered an order in which the court found that DREMC was a statutory employer and that the plaintiffs' tort action was barred by the exclusive remedy provision of the Tennessee Workers' Compensation Act and granted summary judgment in favor of DREMC and Osborne.

Plaintiff filed a motion requesting the court to alter or amend its judgment which granted summary judgment or in the alternative requested a new trial. Judge Holloway decided that inasmuch as the original motion of DREMC seeking summary judgment had been heard by a different judge, he should allow plaintiffs an additional 90 days to respond to the new motion for summary judgment. After the responses had been filed, the trial court again entered an order

granting summary judgment in favor of DREMC and Osborne. As a result of that finding and holding, the trial court did not address the issue of the enforceability of the hold harmless agreement as set out in the contract between Osborne and DREMC.

Several issues have been raised on this appeal including (1) whether Osborne had standing to file a motion for summary judgment; (2) whether the contract entered into between DREMC and Osborne violates public policy; (3) whether the hold harmless agreement contained in the contract is enforceable; (4) whether DREMC owed a duty to the plaintiff, and (5) whether DREMC is a statutory employer.

Although the dispositive issue in this appeal is whether DREMC was a statutory employer for the purposes of the Workers' Compensation Act, we will first address the issue of whether the third party action against Osborne should have been severed or dismissed from the tort action and whether Osborne had standing to file a motion for summary judgment.

We are cognizant from the record that plaintiffs agreed to the order allowing the filing of a third-party complaint by DREMC against Osborne. That order provided that the third-party action would be severed from the trial of the original action but made no provision that it would be severed insofar as the hearing of any motion that might be filed. We are unaware of any rule or authority that denies any party standing to file a motion for summary judgment in this cause. DREMC supported that portion of Osborne's motion seeking summary judgment on the ground that DREMC was a statutory employer and moved for reconsideration of the trial court's prior order denying its motion for summary judgment. Even if Osborne had no standing to file a motion for summary judgment, the trial court could reconsider its prior denial of DREMC's motion for summary judgment inasmuch as that order was an interlocutory order which could be changed or modified at any time prior to becoming final. Tenn. R. Civ. P. 54.02. It, therefore, results that the defendants' motion for summary judgment was properly before the trial court for decision.

We hold that there are no disputed material facts in the record regarding DREMC's right to control the work and the employees of Osborne and that DREMC was a statutory employer as a matter of law for purposes of the Workers' Compensation Act.

A summary judgment should be granted only when the undisputed facts and the inferences reasonably drawn from the undisputed facts support the sole conclusion that the party seeking the summary judgment is entitled to judgment as a matter of law. *Webber v. State Farm Mut. Auto. Ins. Co.*, 49 S.W.3d 265 (269) (Tenn. 2001). *Brown v. Birman Managed Care, Inc.,* 42 S.W.3d 62 (Tenn. 2001).

The party seeking the summary judgment has the burden of demonstrating that no genuine disputed material facts exist and that it is entitled to a judgment as a matter law. *Shadrick v. Coker*, 963 S.W.2d 726, 731 (Tenn. 1998). *Belk v. Obion County*, 7 S.W.3d 34, 36 (Tenn. Ct. App. 1999). In order to be entitled to a judgment as a matter of law, the moving party must either affirmatively negate an essential element of the non-moving party's claim or establish an affirmative defense that

conclusively defeats the non-moving party's claim. *Byrd v. Hall*, 847 S.W.2d 215 n.5; *Cherry v. Williams*, 36 S.W.3d 78, 82-83 (Tenn. Ct. App. 2000); *Armoneit v. Elliott Crane Service, Inc.*, 65 S.W.3d 623, 627-628.

Once the moving party demonstrates that it has satisfied Tenn. R. Civ. P. 56's requirements, the non-moving party must demonstrate how these requirements have not been satisfied. *Nelson v. Martin*, 958 S.W.2d 643, 647 (Tenn. 1997); *Armoneit, supra.* A mere conclusionary generalization will not suffice. *Cawood v. Davis*, 680 S.W.2d 795, 796-797 (Tenn. Ct. App. 1984).

Since only questions of law are involved, there is no presumption of correctness regarding a trial court's grant of summary judgment and our review of the granting of summary judgment is de novo on the record before this court. See *Estate of Hamilton v. Morris*, 67 S.W.3d 786 (Tenn. Ct. App. 2001).

If DREMC was a statutory employer of Mr. Slaughter for purpose of the Workers' Compensation Act, plaintiffs' common law action must be dismissed because workers' compensation benefits would be Mr. Slaughter's exclusive remedy under the provision of Tenn. Code Ann. § 50-6-108. It is Mr. Slaughter's position that his immediate employer, Osborne, was an independent contractor and that DREMC is a "third-party" subject to the provisions of Tenn. Code Ann. § 50-6-112.

The responsibility for workers' compensation benefits is expanded in Tenn. Code Ann. § 50-6-113 to principal and intermediate contractors and subcontractors. That section provides in pertinent part as follows:

> Liability of principal, intermediate contractor or subcontractor. – (a) A principal, or intermediate contractor, or subcontractor shall be liable for compensation to any employee injured while in the employ of any of the subcontractors of the principal, intermediate contractor, or subcontractor and engaged upon the subject matter of the contract to the same extent as the immediate employer.
>
> (b) Any principal, or intermediate contractor, or subcontractor who pays compensation under the foregoing provisions may recover the amount paid, from any person who, independently of this section, would have been liable to pay compensation to the injured employee, or from any intermediate contractor.
>
> (c) Every claim for compensation under this section shall be in the first instance presented to and instituted against the immediate employer, but such proceedings shall not constitute a waiver of the employee's rights to recover compensation under this chapter from the principal or intermediate contractor; provided, that the collection of full compensation from one (1) employer shall bar recovery by the

-4-

employee against any others, nor shall the employee collect from all a total compensation in excess of the amount for which any of said contractors is liable.

(d) This section shall apply only in cases where the injury occurred on, in, or about the premises on which the principal contractor has undertaken to execute work or which are otherwise under the principal contractor's control or management.

In support of their motion for summary judgment, the defendants relied primarily on the provisions contained in the Distribution Line Extension Construction Contract entered into on April 27, 1992, between DREMC and Osborne who are referred to therein as Owner and Contractor. The contract was in effect at the time Mr. Slaughter sustained his injury.

The construction contract was for labor only with all poles and construction material to be furnished by DREMC. Tools and equipment were furnished by Osborne. The contractor was not required to commence any construction after the expiration of one year following acceptance of the contractor's proposal by the owner. However, the record reveals elsewhere that Osborne did work on utility lines for DREMC on a regular basis from year to year.

Article I, Section 2 of the contract provides that from time to time the owner and the contractor may enter into negotiations for the performance of work at labor prices which may differ from those in the contractor's proposal. Section 8 of Article I provides that the cost of labor on construction changes shall be reasonable and in no event shall it exceed two (2) times the labor price quoted in the contractor's proposal for the installation of the unit to be changed.

Article II, Section 2 of the contract provides that DREMC may make changes in, additions to or subtractions from the plan's specifications and construction drawings as conditions may warrant. Section 3(a) of Article II provides that the contractor shall cause the construction work on the project to receive constant supervision by a competent superintendent who shall be present at all times during working hours when construction is being carried on and that directions and instructions given to the superintendent by the owner shall be binding upon the contractor. Section 3(b) of Article II provides that the owner reserves the right to require the removal from the project of any employee of the contractor if in the judgment of the owner such removal shall be necessary to protect the interest of the owner. It further provides that the owner shall have the right to require the contractor to increase the number of his employees and to increase or change the amount or kind of tools and equipment if at any time the progress of the work shall be unsatisfactory to the owner. Section 3(c) of Article II provides that the manner of performance of the work, and all equipment used therein, shall be subject to the inspection, tests and approval of the owner, and that the owner shall have the right to inspect all payrolls and other data and records of the contractor relevant to the work. That section further provides that the contractor is required to provide all reasonable facilities necessary for such inspections and tests, and that the contractor shall have an authorized agent to accompany the inspector when final inspection is made and, if requested by the owner, when any other inspection is made.

The amendatory agreement to the contract required Osborne to take out and maintain throughout the contract period workers' compensation and employer's liability insurance, public liability insurance covering all operations under the contract, automobile liability insurance on all motor vehicles used in connection with the contract and excess liability insurance of not less than $5,000,000. The amendatory agreement further provided that the owner shall have the right at any time to require public liability insurance and property damage liability insurance greater than the minimum limits required by the agreement.

Osborne was to be paid on the basis of the number of construction units actually installed at the direction of the owner. Article IV, Section 1 of the contract provides that Osborne shall at all times take all reasonable precautions for the safety of employees on the work. Article IV, Section 1(i) requires the contractor to submit to the owner monthly reports in duplicate of all accidents with such data as may be prescribed by the owner. Section 2(j) of Article IV provides that the contractor shall not proceed with cutting trees or clearing right-of-way without written notification from the owner that proper authorization has been received from the owner of the property and the contractor was required to notify the owner whenever any land owner objected to the trimming or felling of any trees or the performance of any other work on his land in connection with the project and was required to obtain the written consent of the owner before proceeding in any such case.

The contract provides in Article IV, Section 1(f) that the contractor shall hold the owner harmless from any and all claims for injuries to persons or for damages to property happening by reason of any negligence on the part of the contractor or any of the contractor's agents or employees during the control by the contractor of the project or any part thereof.

Finally, the contract prohibits the contractor from assigning the contract or entering into a contract with any person, firm or corporation for the performance of the contractor's obligations thereunder or any part thereof without the approval in writing of the owner.

In response to the motions for summary judgment filed by DREMC and Osborne, plaintiffs submitted identical affidavits of three Osborne employees, Monty O'Neal, Robert Williams and plaintiff James Randall Slaughter. The import of those affidavits was that Osborne workers provided their own tools and equipment; the Osborne workers never took directions from employees of DREMC and that DREMC did not control their work. They did state originally that a general foreman of DREMC would visit the work about once per week. Those three affiants filed subsequent affidavits wherein DREMC's foremen visiting the work site were not mentioned and in which they asserted that DREMC did not control and had no right to control their work.

Plaintiffs also submitted the affidavits of Richard Turner, General Manager of the Lewisburg Electric System, and Frank Pruett, who has held various positions in the electric utility industry. Turner stated that contractors under a unit basis contract, such as the one being done by Osborne, are independent contractors and that the utility never really has the right to control the work which is done by the contractor. Pruett concluded that plaintiff James Randall Slaughter was working an energized or "hot" line and further testified that had the work been done by employees of DREMC,

the work would have been done on a "cold" line. He therefore concluded that the work done by the employees of Osborne was not the same type of work as that done by DREMC. Pruett further stated that contracted employees never consider that the electric utility has a right to control their work in any manner whatsoever.

The plaintiffs' expert, John G. St. Clair, a professional engineer, stated that DREMC's failure to provide sufficient oversight of Osborne's work practices to insure safety of the employees was a cause of the accident sustained by plaintiff James Randall Slaughter. He concluded that DREMC did not have the right to control the employees of Osborne. In concluding that DREMC did not have the right to control the work. St. Clair relied primarily on Article IV, Section 1(f) of the contract which provides as follows:

> The project, from the commencement of work to completion, or to such earlier date or dates when the owner may take possession and control in whole or in part as hereinafter provided shall be under the charge and control of the contractor ...

We hold that the provision as cited pertains to liability between the parties to the contract and the hold harmless agreement and is not dispositive of the issue of DREMC's right to control Osborne's employees and their work.

Excerpts of the discovery deposition of Donald Cathey, field engineer and assistant district manager of DREMC, were submitted by the plaintiffs. Cathey testified that he gave the Osborne employees their work assignments and that they had their own superintendent that would check on them from time to time. He stated that Osborne had two crews of employees and that each crew had a foreman and that he would tell the foreman what he wanted done. He further testified that if DREMC's inspector found any deficiencies in the work, that fact was reported to Osborne's foremen with a request to go out and fix the deficiencies. Cathey further testified that Osborne was paid on a unit basis - that is so much for setting a pole, so much for framing it and so much for hanging a transformer. He said taxes were not withheld by DREMC on the Osborne employees and that he never hired any of the work crew and that to his knowledge no Osborne employee had been hired or fired by DREMC. He related that sometimes in case of emergencies, DREMC would use equipment belonging to Osborne. He further said that the description of the work done by Osborne was not limited, it was whatever DREMC wanted them to do.

Portions of the discovery deposition of Joe H. Nix, an employee of DREMC, were submitted by plaintiffs. Nix testified that other contractors had done work for DREMC. He did not know whether the Osborne crews and the DREMC's crews used the same procedures. Nix further stated that most of the reconductoring at DREMC was done by contract crews.

The basis of liability under the Workers' Compensation Act is the employer/employee relationship. In analyzing whether a relationship is that of employer/employee or that of independent contractor, the court in *Stratton v. United Inter-Mountain Telephone Company,* 695 S.W.2d 947

(Tenn. 1985), held that the following are factors to be considered with no one factor being necessarily dispositive: (1) right to control the conduct of work; (2) right of termination; (3) method of payment; (4) whether alleged employee furnishes his own helpers; (5) whether alleged employee furnishes his own tools; and (6) whether one is doing "work for another." The court further held that although no single test is necessarily dispositive, the importance of the right to control the conduct of the work has been repeatedly emphasized, citing *Carver v. Sparta Electric System*, 690 S.W.2d 218 (Tenn. 1985) and *Wooten Transports, Inc., v. Hunter*, 535 S.W.2d 858 (Tenn. 1976). The court further emphasized that the test was not whether the right to control was exercised, but merely whether the right of control existed, again citing *Wooten Transports, Inc., v. Hunter, supra.*

Courts generally employ two tests to determine whether the relationship is that of a statutory employer or independent contractor; (1) whether the work being performed by the contractor in question "Osborne" is the same type of work usually performed by the company "DREMC" or as part of the regular business of the company, and (2) whether the company "defendant" has a right to control employees of the contractor. *Barber v. Ralston Purina*, 825 S.W.2d 1991 (Tenn. Ct. App. 1991), citing *Stratton v. United Inter-Mountain Telephone Company, supra*, and *Hendrix v. Ray-Ser Dyeing Co.*, 462 S.W.2d 483 (Tenn. 1970).

In granting the motion for summary judgment in favor of DREMC and Osborne, the trial court relied upon the following provisions contained in the distribution of line extension construction contract entered into between DREMC and Osborne:

(1) The requirement that the contractor employ a superintendent with direction and instructions given to the superintendent by DREMC being binding upon the contractor;

(2) The right to require Osborne to increase the number of employees and to require Osborne to change the amount or kind of tools or equipment used;

(3) The provision that the manner of performance of the work and all equipment used therein shall be subject to the inspection, tests, and approval of DREMC;

(4) The right of DREMC to inspect all payrolls and records of Osborne related to the work;

(5) The right given to DREMC to demand Osborne to have an inspection made by an engineer approved by DREMC to determine whether or not defects exist;

(6) The provision that DREMC provides all the poles and construction equipment to be used by Osborne on the project; and

(7) The provision that DREMC is required to provide to Osborne specific instruction as to location and extent of work to be performed on energized lines, if any.

Upon consideration of those factors the trial court found that DREMC had the right to control the work being performed by Osborne.

Plaintiffs advance three principal arguments in support of their contention that DREMC was not a statutory employer. First, they say that DREMC did not control the work that was being done under the contract entered into between it and Osborne. We hold that whether the work was controlled by DREMC is not dispositive to the issue of control, the key issue being whether the right to control existed.

Next, plaintiffs contend that DREMC did not have the right to control the work. In support of that contention, they rely primarily on the affidavits of their experts and some of the employees of Osborne. Plaintiffs rely heavily on the affidavit of their expert John G. St. Clair who opined that DREMC did not have the right to control the employees of Osborne under the terms and provisions of the subject contract. Under our system of jurisprudence lay persons cannot decide questions of law. The issue of whether or not the contract gave DREMC the right to control is a question of law to be determined by the court because that involves an interpretation of the contract. The interpretation of a written agreement is a matter of law and not fact. *Rapp Const. Co., Inc., v. Jay Realty Co.*, 809 S.W.2d 490 (Tenn. Ct. App. 1991). If a contract is plain and unambiguous, the meaning thereof is a question of law and it is the court's function to interpret the contract as written according to its plain terms. *Bradson Mercantile Inc., v. Crabtree*, 1 S.W.3d 648 (Tenn. Ct. App. 1999)

Plaintiffs further argue that the work being done under the contract was not a usual part of the work being done by DREMC. In particular, plaintiffs argue that Osborne was required to work on energized or "hot" lines whereas DREMC employees worked on "cold" or de-energized lines. The record is replete with evidence that the decision was left to Osborne's foremen and/or their linemen to decide whether the lines were to be worked "hot" or "cold". There is nothing in the contract between DREMC and Osborne requiring Osborne employees to work on energized lines. In fact, Article IV, Section (1)(a) prohibited Osborne from requiring any employees to perform work upon energized lines or upon poles carrying energized lines unless specific instructions were given as provided by Article II, Section 1(g) of the contract as to location and extent of work to be performed on energized lines, if any. There is nothing in the record that any specific instructions was ever given by DREMC requiring Osborne's employees to work on energized lines. A company or other business is considered a principal contractor if the work being performed by a subcontractor's employees is the same type of work usually performed by the company's employees. *Murray v. Goodyear Tire & Rubber Co.*, 46 S.W.3d 171 (Tenn. 2001) citing *Barber v Ralston Purina, supra.* Blake Butler, Director of Engineering and Technical Services for DREMC, stated in his affidavit that the work which was being performed by Slaughter at the time of his injury was typical of the type of work usually performed by regular DREMC employees.

We hold that Osborne's employees were performing the same type of work as that usually done by DREMC. Even if a company contracts out work other than the type of work usually performed by its employees, that company may, nevertheless, be considered a principal contractor based on the right of control over the conduct of the work and over the employees of the subcontractor. See *Murray v. Goodyear Tire & Rubber Co.*, *supra*, at 176.

DREMC is a statutory employer within the meaning of the Workers' Compensation Act, and as a result thereof, plaintiffs' common law action in tort for personal injuries cannot be maintained. Under the provisions of Tenn. Code Ann. § 50-6-108 workers' compensation benefits are plaintiffs' exclusive remedy. That issue being dispositive of this action, like the trial court, we find no reason to consider Osborne's contention that the hold harmless and indemnity agreement contained in the contract between it and DREMC is void and unenforceable.

Finally, plaintiffs contend that the contract between DREMC and Osborne should be prohibited as a matter of public policy. In *Stratton v. Inter-Mountain Telephone Company, supra*, at 954, the court said:

Allowance of a common-law suit against the Telephone Company after recovery of worker's compensation benefits from plaintiff's immediate employer would do violence to the comprehensive scheme of worker's compensation. It would eliminate the incentive of general contractors to hire insured subcontractors, which is part of the policy underlying the principal contractor provision. The worker's compensation law is a comprehensive scheme that reflects a compromise between the interests of employers and employees. It provides an expeditious and certain recovery for the employee while limiting the amount of liability to which the employer is exposed.

We are unaware of any public policy that has been violated as a result of the subject contract. Mr. Slaughter has received his workers' compensation benefits as provided by law. Any desired change in the scheme of benefits and liability must of necessity address itself to the General Assembly.

The judgment of the Circuit Court is affirmed and this cause is remanded with costs of the appeal taxed to Appellants.

 

 

_____

VERNON NEAL, SPECIAL JUDGE